MATTHEW A. LESNICK (SBN 177594)
    matt@lesnickprince.com
CHRISTOPHER E. PRINCE (SBN 183553)
    cprince@lesnickprince.com
WILLIAM F. GOVIER (SBN 262810)
    wgovier@lesnickprince.com
LESNICK PRINCE & PAPPAS LLP
185 Pier Avenue, Suite 103
Santa Monica, CA  90405
Telephone: (310) 396-0964
Facsimile:  (310) 396-0963

Proposed Counsel for Debtor and Debtor in
Possession Net Data Centers, Inc.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>NET DATA CENTERS, INC.,<br><br>Debtor and Debtor in Possession. | Case No. 2:15-bk-12690-BB<br><br>Chapter 11<br><br>**DECLARATION OF PERVEZ P. DELAWALLA IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**<br><br>Hearing:<br>Date:    February 25, 2015<br>Time:    2:00 p.m.<br>Place:   Courtroom 1475<br>            Roybal Federal Building<br>            255 E. Temple Street<br>            Los Angeles, CA 90012 |

I, Perez P. Delawalla, declare:

1.    I am the President and Chief Executive Officer of Net Data Centers, Inc., the debtor and debtor in possession in this bankruptcy case (the "Debtor").  I am also a member of the board of directors of the Debtor and its sole shareholder.  Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration and,

if called as a witness, I could and would testify competently to such facts. I make this declaration in support of the following "first day motions" filed by the Debtor: (a) motion to approve payment of prepetition wages and benefits; (b) motion to permit Debtor to maintain prepetition bank account; and (c) motion to honor certain pre-paid customer services.

### Debtor's Business

2. The Debtor is an internet-based data center service provider delivering redundant power, cooling, network connectivity and managed services within its data center locations. The Debtor provides access to internet-based applications, providing file and data storage directly to our customers. Leading social networks, enterprises, finance, content companies, and communications service providers rely on the Debtor's services for uninterrupted operations to support their mission critical applications. Additional information about the Debtor's operations and management can be found on its website: www.netdatacenters.com.

3. The Debtor was founded in or about 2001 and incorporated in 2002, and currently maintains 7 data centers in Los Angeles, New Jersey and Virginia to provide business support services to small and large businesses worldwide. The Debtor also has additional points-of-presence and peering networks in various locations.

4. The Debtor's data centers are specially designed to meet or exceed the most stringent requirements of demanding high power and high-density systems offering uninterrupted operations for its customer's businesses. The facilities include state of the art systems for fire suppression, climate control, uninterrupted power supply ("UPS"), backup power generators, all protected by state of the art physical security systems.

5. In addition, the Debtor's facilities are wired to enable its customers to hook into a wide variety of commercial, fiber optic internet service providers. The Debtor can also handle cross connect runs directly to customer and/or run fiber to "Meet-Me-

Rooms" to provide additional connectivity.  The Debtor also offers an IP blend bandwidth of top-tier providers that is made available to customers that wish to have multiple transit providers as an option.

6.     The Debtor also provides network services to its customers with increased protection from large scale DDoS attacks and viruses before they are able to reach the customer's network, it also provides customers with backup solutions that permit the backup and recovery of individual files or complete systems.  Backups are stored on geographically diverse clusters which communicate with encrypted connections.

7.     The Debtor's business departments are comprised of several teams which support daily business operations. Human Resources, Accounting/Finance, Sales, and Marketing are responsible for duties common to most organizations. The Operations department is comprised of Network, Infrastructure, Information Technology, Client Services and Account Management teams.

### **Bankruptcy Filing**

8.     The Debtor was forced to file this chapter 11 case to deal with several of its real property leases, which are substantially above current market rates.  In particular, two of the Debtor's landlords had commenced, or were preparing to commence, litigation against the Debtor.  The Debtor intends to utilize chapter 11 to address the above-market leases and successfully reorganize.  If the Debtor's leases are brought more in line with current market rates, the Debtor will be a profitable and valuable business.

9.     The data center marketplace grew quickly from 2007 through 2010, and the Debtor believed that demand would outpace supply.  Even during the economic downturn beginning in late 2008, the U.S. data center market, including the Debtor, was adding jobs and growing revenues.  The Debtor's business grew from one customer in 2001 to become a self-funded, nationally recognized data center company.

3

10. In 2011, however, customer demand began to slow. But due to the tremendous success of the data center business throughout the recession, the construction of new data center space continued, eventually causing supply to outstrip demand in certain cities. Unfortunately, the Debtor had entered into its primary commercial leases at the height of the data center boom. As a result, the Debtor's leases are now approximately 30-35% above current market rates.

11. In late 2012, the Debtor began attempting to negotiate rent accommodations with its landlords. In 2013, the Debtor converted certain deferred rent into promissory notes carrying double-digit interest rates. Although this provided temporary relief at best, the Debtor accepted the terms in order to avoid, among other things, defaulting on its primary leases.

12. The Debtor also implemented other cost cutting measures (such as reducing the number of employees) to help its bottom line. However, the reduced expenses were not enough to overcome the inflated lease rates and downward price pressure in the data center market.

13. The Debtor ultimately fell behind on some of its rent payments. On or about February 11, 2015, one of the Debtor's landlords for three of its California properties, served the Debtor with a 5-day notice to pay rent or quit. The Debtor was able to negotiate a forbearance agreement, extending the time to pay its rent until February 23, 2015.

14. Unable to meet its rent obligations, the Debtor filed this chapter 11 in order to address its lease issues for the benefit of its creditors, customers, employees and other stakeholders. The Debtor intends to work diligently to continue its discussions with its landlords and other creditors, or act quickly to reject the most burdensome leases and consolidate its operations.

**Prepetition Bank Account**

15.     Substantially all of the Debtor's active business (accounts receivable, accounts payable, payroll, taxes) is conducted through one checking account at City National Bank, and has been for several years. In addition to being the central point of payment for all the company's obligations, it is also the account into which more than 150 customers automatically deposit their payments to the Debtor. As a result, closing this account would cause significant disruption and delay to the Debtor's cash flow.

**Prepetition Employee Wages**

16.     The Debtor currently has 32 employees, including myself.[1] Employee payroll is paid twice per month. The Petition Date (February 23, 2015) occurred in the middle of the pay period ending Saturday, February 28, 2015. This results in the employees not being able to be paid for their pre-petition time from the beginning of the pay period, February 11, 2015, through February 23, 2015, absent relief from this Court. The total payroll for this prepetition stub period is approximately $64,000, including overtime and holiday pay amounts. In addition, the Debtor's employees have accrued varying amounts of paid vacation and sick leave within the 180 days preceding the Petition Date. None of the employees are owed more than $10,000 in prepetition wages and benefits.

17.     There are also two individuals (a Corporate Systems Admin, and one Executive Assistant) who were formerly W-2 employees but are now treated as independent contractors because, among other things, they work from home or outside of the office. They still work full-time for the Debtor. These individuals are also subject to the same stub period issues as the employees described above. They are owed approximately $3,000 for the prepetition stub period.

---

[1] I understand that I am an insider of the Debtor and cannot be paid until my compensation is separately approved in the chapter 11 case.

5

18. In addition, the Debtor owes approximately $28,000 of ordinary course sales commissions to four full-time sales people for sales generated prior to the Petition Date. Two of the sales people are owed more than $12,475 in total prepetition stub period wages and commission. By this motion, the Debtor is only seeking permission to pay each sales person up to the priority amount specified in § 507(a)(4).

19. All of the employees, independent contractors and sales agents described above are still employed by the Debtor and are critical to the Debtor's operations going forward.

20. In addition to wages, the Debtor offers its employees paid vacation and sick days, which may be accrued in accordance with the company's policies. The Debtor seeks permission to permit its employees to carry over their accrued vacation and sick days that were earned within 180 days prior to the Petition Date. The Debtor also offers certain healthcare benefits to its employees, which are paid by the Debtor, in advance, at the beginning of each month. (Because the February healthcare payments were all paid prepetition, they are not the subject of this motion.)

21. In its fifteen year history, the Debtor has never missed a payroll, and I believe it is critically important to ensure that our employees are paid timely, especially given the extra uncertainty caused by a chapter 11 filing. The Debtor provides mission-critical, 24-hour, 7-day per week support services to its customers, and the customers rely on the Debtor to ensure that their servers are running correctly at all times. Any disruption of services could be devastating to the Debtor's reputation, as no company would want to trust putting their servers in the hands of an unreliable company. In order to make sure that the Debtor can provide top-notch services, it is vital that it retain its employees and that its employees know that they will be paid for their work.

22. The Debtor currently has approximately $2 million in cash on hand, so there are plenty of resources to pay the prepetition wages and benefits, and there is no

risk that the payment will render the Debtor administratively insolvent. To the best of my knowledge, no party asserts a security interest in the Debtor's cash.

### Prepaid Customer Accounts

23. Beginning in October 2014, the Debtor implemented a program with its customers in order to raise more cash per month than the customer contracts would naturally generate. This took the form of a "loyalty package" in which the company offered certain discounts on services if the customers prepaid for services. Specifically, the company offered a 9% discount if the customer prepaid for 12 months of services, a 6% discount if the customer prepaid for six months of services, and a 3% discount if the customer prepaid for three months of services. Eleven customers accepted the offer and prepaid for various recurring monthly fees, such as space, power, connectivity, and other services. I believe it is critical to be able to continue to offer these services to these customers on the "loyalty package" terms for the duration of each participating customer's specific arrangement. The "end dates" associated with the prepayments are sprinkled across 2015, with the latest end dates being in early 2016. Again, this only affects 11 customers total. This would mean that, for a period of time during the chapter 11 case, such customers would be receiving services in exchange for no recurring monthly payments – but that is simply because those services were paid for in advance. The number of customers at issue is not extensive. The vast majority of the company's nearly 200 customers are on monthly recurring fee schedules, but there are a few who opted into the "loyalty package" that must be accounted for in this chapter 11 case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on February 25, 2015 at El Segundo, California.

                                                  Pervez P. Delawalla

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

   185 Pier Avenue, Suite 103, Los Angeles, California 90405

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF PERVEZ P. DELAWALLA IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 25, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **William F Govier**    wgovier@lesnickprince.com, tmims@lesnickprince.com
- **Ron Maroko**    ron.maroko@usdoj.gov
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) February 24, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY:**
Hon. Sheri Bluebond
United States Bankruptcy Court
255 E. Temple St., Suite 1482
Los Angeles, CA  90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 25, 2015 | Matthew A. Lesnick | /s/ Matthew A. Lesnick |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    **F 9013-3.1.PROOF.SERVICE**