1  **Paul A. Beck** (SBN 79760)
   **Lewis R. Landau** (SBN 143391)
2  *lew@landaunet.com*
   **Law Offices of Paul A. Beck, APC**
3  13701 Riverside Drive, Suite 701
   Sherman Oaks, California 91423
4  Tel:  (818) 501-1141; Fax: (818) 501-1241

5  Attorneys for Debtor and Debtor in Possession
   Net Data Centers, Inc.

6

7                 **UNITED STATES BANKRUPTCY COURT**

8                 **CENTRAL DISTRICT OF CALIFORNIA**

9                     **LOS ANGELES DIVISION**

10

11  In re                                    Case No.: 2:15-bk-12690-BB
                                             Chapter 11
12  Net Data Centers, Inc.,
                                             **DEBTOR'S NOTICE OF AND MOTION**
13                          Debtor.          **TO ESTABLISH PROCEDURES FOR THE**
                                             **SALE OF ESTATE'S EAST COAST**
14                                           **ASSETS**

15                                           **[11 U.S.C. § 363(b); LBR 6004-1(b)]**

16                                           Date:      September 1, 2015
                                             Time:      10:00 a.m.
17                                           Place:     Courtroom 1475; Judge Bluebond
                                                        U.S. Bankruptcy Court
18                                                      255 E. Temple Street, 14th Floor
                                                        Los Angeles, CA 90012
19

20

21

22

23

24

25

26

27

28

–1–

1    Net Data Centers, Inc. ("Debtor"), Debtor in Possession in the within Chapter 11 case,

2    herein moves for entry an order in the form attached hereto as Exhibit 1 establishing procedures in

3    connection with the sale of Debtor's East Coast assets pursuant to 11 U.S.C. § 363(b) and Local

4    Bankruptcy Rule 6004-1(b) ("Motion").  Debtor's Motion is set forth in the following

5    memorandum of points and authorities, as supported by the attached Declaration of Pervez P.

6    Delawalla ("Delawalla Declaration") and Ervin Terwilliger ("Terwilliger Declaration") and the

7    exhibits hereto and referenced herein.

8         A hearing will be held on this Motion on September 1, 2015 at 10:00 a.m. in the

9    Courtroom of the Honorable Sheri Bluebond, United States Bankruptcy Judge located in

10    Courtroom 1475, U.S. Bankruptcy Court, 255 E. Temple Street, 14th Floor, Los Angeles, CA

11    90012.

12         *Pursuant to LBR 6004-1(b):* **Opposition. Any opposition and accompanying**

13    **memorandum of points and authorities and declarations must be filed and served at least 1**

14    **day prior to the hearing, unless otherwise ordered by the court. Documents filed in**

15    **opposition to the motion must be served by personal delivery, messenger, fax, or email. A**

16    **judge's copy of the opposition must be served on the judge in chambers in accordance with**

17    **LBR 5005-2(d).**

18         Wherefore, Debtor respectfully requests that the Court enter the order in the form attached

19    hereto as Exhibit 1 granting the Motion and such other and further relief as the Court deems just

20    and proper under the circumstances.

21    Dated:  August 25, 2015                    **Respectfully submitted,**

22                                               **Law Offices of Paul A. Beck**
                                                 **A Professional Corporation**
23

24
                                               By */s/ Lewis R. Landau*
25                                             Paul A. Beck
                                               Lewis R. Landau
26                                             Attorneys for Debtor

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### THE COURT SHOULD APPROVE THE PROPOSED SALE PROCEDURES IN ANTICIPATION OF AN AUCTION SALE OF DEBTOR'S EAST COAST ASSETS

**1.  Case History and Status.**

On February 23, 2015, the Debtor filed a voluntary chapter 11 petition.  The Debtor continues to manage and operate its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  On April 24, 2015 an unsecured creditors committee was appointed.

The Debtor is an internet-based data center service provider delivering redundant power, cooling, network connectivity and managed services within its data center locations.  The Debtor provides access to internet-based applications, providing critical file and data storage and related services directly to its customers.  Leading social networks, enterprises, finance, content companies, and communications service providers rely on the Debtor's services for uninterrupted operations to support their applications.  Additional information about the Debtor's operations and management is available on its website at *www.netdatacenters.com.*

Prior to June 30, 2015 the Debtor was a party to 9 unexpired leases of non-residential real property, on which it operates eight (8) data centers, four (4) in New Jersey and Virginia (involving five (5) leases), and four (4) in Los Angeles County (involving three (3) leases), and a corporate office located in El Segundo, California.  The Debtor's various data centers host over 170 of its clients' databases of critical operating data, to which their customers and clients must have continuous, immediate and seamless access at all times, 24 hours a day, 7 days a week.  The Debtor manages the business operations of its data centers, collects customers' service agreement payments, services its customers' needs at each data center location, and pays the expenses of operating and managing the data centers.  The Debtor generates its revenues primarily from its customers' managed service agreements.

The Debtor's customers, in turn, are provided with space and power pursuant to and governed by the Debtor's Master Service Agreements.  Since the Debtor's facility leases were entered into at the height of the data center real estate market approximately 8 years ago, the

1    Debtor's leases with its landlords were all at rates that were significantly higher than current fair

2    market values, and that generated the Debtor's current need for reorganization.

3          As of July 1, 2015 the Debtor rejected its leases with the affiliates of DuPont Fabros

4    Technology, L.P. ("DFT") for its East Coast data centers and Charter Holdings, L.P. ("Charter")

5    for its data center facility located at 1200 W. 7th Street, Los Angeles, California.  *See*, ECF # 178.

6    Although the DFT and Charter leases are rejected, valuable Debtor and customer equipment

7    remains on site at the DFT and Charter data centers.  Debtor continues to provide services to

8    customers pending arrangements to assign customers and equipment to a new operator at the DFT

9    or Charter facilities or transitioning customers and equipment to Debtor's other facilities.  Debtor

10   has entered into agreements with both DFT and Charter to address the period after rejection

11   pending further arrangements.  The Court approved Debtor's stipulation with DFT on July 9,

12   2015.  *See*, ECF # 202.

13         The Debtor's ability to transition out of the DFT and Charter facilities and realize fair

14   value from its furniture, fixtures and equipment and other intangible assets relating to the

15   operations of the East Coast data centers (collectively, the "Purchased Assets") is an important

16   component of its overall reorganization.  Debtor intends use the proceeds from the sale

17   contemplated by the APA (defined below) to cure its retained leases subject to assumption thereof

18   and fund its overall chapter 11 reorganization.  The sale contemplated herein disposes of the

19   Purchased Assets.

20       **2.   The Subject Sale Transaction.**

21         As mentioned above, the Debtor was a party to four (4) real property leases in respect of its

22   East Coast data centers with the following affiliates of DFT: (1) Whale Ventures, LLC (property

23   located at 101 Possumtown Rd., Piscataway, New Jersey); (2) Fox Properties, LLC (property

24   located at 44521 Hastings Drive, Ashburn, Virginia); (3) Grizzly Ventures, LLC (property located

25   at 44480 Hastings Drive, Ashburn, Virginia); and (4) Lemur Properties, LLC (property located at

26   1780 Business Center Drive, Reston, Virginia) (collectively "DFT Leases").  The DFT Leases

27   were rejected by operation of law on July 1, 2015.

28

1   The Purchased Assets being sold pursuant to the transaction contemplated by the APA are

2   located within the facilities that were formerly subject to the DFT Leases or otherwise related to

3   the Debtor's operations at such facilities.  Debtor has remained in occupancy of the facilities

4   formerly subject to the DFT Leases pursuant to a Court approved Stipulation re Post-Rejection

5   Transition Period and Payments of Rent and Expenses ("Stipulation") [ECF #199, 202].

6   However, the Debtor intends to terminate the Stipulation effective upon closing of the sale subject

7   to the auction. To secure occupancy rights, the buyer will be required to negotiate and enter into

8   leases with the DFT affiliates.

9   Bidders interested in securing new leases with the DFT affiliates are encouraged to contact

10  Debtor's investment banker, 321 Capital Partners, to make arrangements to receive DFT's

11  standard lease terms by executing a non-disclosure agreement.  The DFT affiliates are under no

12  obligation to enter into new leases with buyer and buyer is solely responsible for negotiating and

13  entering into any such new leases with the DFT affiliates.

14  On May 11, 2015 the Debtor retained 321 Capital Partners, LLC ("321 Capital") as an

15  investment banker and the Court approved 321 Capital's employment pursuant to order entered

16  June 22, 2015.  See, ECF #s 115, 177.  321 Capital specializes in strategic transactions for data

17  center facilities.  321 Capital thereafter engaged in an extensive marketing effort for the Debtor's

18  East Coast assets as set forth in the Summary Marketing Report a true and correct copy of which

19  is attached hereto as Exhibit 2.  321 Capital's efforts resulted in securing the sale opportunity

20  contemplated herein.

21  On July 20, 2015 Debtor entered into the Letter of Intent ("LOI") with Blackstreet Capital

22  Holdings ("BCH") a true and correct copy of which is attached hereto as Exhibit 3.  The LOI

23  contemplated a stalking horse transaction whereby an affiliate of BCH, would acquire the

24  Purchased Assets for $2 million subject to various terms and conditions and subject to overbid.

25  The LOI contemplated an August 31, 2015 closing, which was not feasible under the

26  circumstances.

27  Nonetheless, the parties continued working on an Asset Purchase Agreement ("APA") and

28  the most current form of the APA is attached hereto as Exhibit 4.  The APA contemplates the

same transaction as contained in the LOI with Netunim, Inc. as BCH's buyer designee (the "Stalking Horse Bidder"). Debtor anticipates that the executed APA will be in substantially the form as set forth in Exhibit 4. The APA contemplates a sale of the Purchased Assets for $2 million with and auction (if necessary) and sale hearing to be held on September 24, 2015 and closing to occur promptly thereafter, and in any event by September 30, 2015.

Debtor believes that a sale of the Purchased Assets to the Stalking Horse Bidder or an overbidder is an exercise of sound business judgment and a transaction in the best interests of the estate and creditors. The transaction allows the Debtor to realize a substantial return on the value of the Purchased Assets, which value is at risk due to the potential for a thirty-day termination notice under the DFT Stipulation. Debtor will lose substantial asset value if it is forced to remove the tangible Purchased Assets located in the DFT data centers, which it will be compelled to do if DFT terminates the Stipulation. Moreover, Debtor will enter into a Transition Service Agreement ("TSA") with the Stalking Horse Bidder whereby Debtor will continue to service customers on behalf of the Stalking Horse Bidder. The TSA also provides for additional consideration to the Debtor. The transactions contemplated by the APA also enable the Debtor to realize cash proceeds, which will enable it to fund a plan of reorganization around the Debtor's remaining assets.

**3. Proposed Sale Procedures.**

The APA contemplates a two-step process to obtain approval thereof. First, pursuant to Article 3 of the APA, the Court is requested to enter the sales procedures order attached hereto as Exhibit 1 containing the following terms:

Section 3.1    Entry of Sale Procedures Order. No later than three (3) business days after execution of the APA by the parties hereto, Debtor shall file a motion in form and substance reasonably satisfactory to Stalking Horse Bidder (the "Sales Procedures Motion") with the Bankruptcy Court seeking, on an expedited basis, entry of an order in form and substance satisfactory to Stalking Horse Bidder which shall include all of the following provisions (the "Sale Procedures Order"):
      (a)    Competing offers to acquire the Purchased Assets shall:
          (i)    be submitted in writing to counsel for Debtor and Stalking Horse Bidder and 321 Capital on or before 4:00 p.m. (Pacific Time) on September 22, 2015 (the "Bid Deadline");

(ii)    provide for an all-cash purchase price to be paid to Debtor that exceeds the Purchase Price herein by at least Two Hundred Thousand Dollars ($200,000);

(iii)    be accompanied by a signed asset purchase agreement in form and substance substantially similar to the APA, together with a redlined, marked copy showing all changes to the APA (the "Competing Agreement");

(iv)    must not be subject to due diligence contingencies or other conditions beyond those imposed by Stalking Horse Bidder; any bidder other than Stalking Horse Bidder shall have an opportunity to review the books and records of the Debtor, provided that such bidder shall execute a non-disclosure agreement in form and substance acceptable to Debtor in Debtor's sole discretion (notwithstanding the foregoing, all due diligence must be completed by all qualified bidders prior to Auction (as defined below);

(v)    remain open until the conclusion of the Sale Hearing (as defined below);

(vi)    contain terms and conditions no less favorable to Debtor than the terms and conditions of the APA;

(vii)    be accompanied by admissible evidence in the form of affidavits or declarations establishing the bidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code;

(viii)    be accompanied by admissible evidence in the form of affidavits or declarations establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(ix)    be accompanied by a cashier's check made payable to the order of Debtor in an amount of One Hundred Thousand Dollars ($100,000.00) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Debtor may retain the Overbidder's Deposit for application as a non-refundable deposit for application towards payment of the Breakup Fee (as defined in Section 3.1(d) below) to Stalking Horse Bidder and the remainder to be applied against the purchase price at the closing of the transaction, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Debtor will promptly return the Overbidder's Deposit to Overbidder;

(x)    be for all of the Purchased Assets; and

(xi)    contain a proposed closing date that is not later than the Closing Date under the APA.

(b)    If any bidders have submitted a qualifying competing bid in accordance with the Sale Procedures Order hereof (each such bid, a "Qualified Bid"), then a public auction of the Purchased Assets (the "Auction") shall be held at 10:00 a.m. (Pacific Time) on September [24], 2015 (or such other date as set by the Bankruptcy Court) at the United States Bankruptcy Court, Courtroom 1475, 14th Floor, Roybal Federal Building and Courthouse, 255 East Temple Street, Los Angeles, California 90012.  The Auction shall be governed by the following procedures:

(i)    All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in

connection with any disputes relating to the Auction or the sale of the Purchased Assets;

          (ii)      Bidding will commence at the amount of the highest Qualified Bid;

          (iii)      Each subsequent bid shall be in increments of no less than $100,000; and

          (iv)      For the Stalking Horse Bidder, the Breakup Fee shall be taken into account in the bidding process, such that, for illustration purposes, if the bid is $3,000,000 the Stalking Horse Bidder may bid $2,900,000 cash plus the value of the Breakup Fee to match the $3,000,000 bid.

          (c)      A hearing to approve the successful bid at the Auction, or, if no auction is held, to approve the APA, shall be scheduled immediately following the Auction, on the date of the Auction;

          (d)      The Breakup Fee in an amount of One Hundred Thousand Dollars ($100,000.00) (the "Breakup Fee") is approved and shall be paid to Stalking Horse Bidder in the event that the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a party other than Stalking Horse Bidder or enters an order confirming a plan of reorganization of Debtor (other than a plan under which Stalking Horse Bidder acquires the Purchased Assets) no later than the closing of the sale of the Purchased Assets to a third party;

          (e)      No other bidder for the Purchased Assets shall be entitled to payment of any breakup fee;

          (f)      Any entity that fails to submit a timely, conforming Qualified Bid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction or the Sale Hearing; and

          (g)      If no timely, conforming Qualified Bid is submitted, Debtor shall request at the Sale Hearing that the Court approve the proposed sale of the Purchased Assets to Stalking Horse Bidder under the APA.

*See*, APA at Exhibit 4 hereto, Article 3.

The foregoing terms are fair, reasonable and appropriate to maximize the estate's recovery on its East Coast data center assets. As set forth in the Terwilliger Declaration and the Summary Marketing Report attached hereto as Exhibit 2, the bidding procedures outlined in the APA are based on bidding procedures that 321 Capital has successfully used in past section 363 sales, in which multiple rounds of bidding resulted in significant improvement to the total purchase price. The initial overbid of $200,000 covers the break-up fee, does not "chill" bidding, while adequately compensating the Stalking Horse Bidder. Subsequent bid increments of $100,000 are in-line with a transaction of this scale and should result in active participation by bidding parties. Given its

1  extensive marketing efforts to date, 321 Capital has already identified the pool of potential bidders

2  that may be interested in participating in the auction sale.  *See*, Exhibit 2 marketing report.

3  In addition, the Stalking Horse Bidder has undertaken significant efforts in completing its

4  due diligence including, without limitation, conducting a detailed review of the Debtor's financial

5  statements, reviewing Debtor's contracts with customers and vendors of the East Coast data

6  centers, conducting discussions with customers and employees, and analyzing the viability of the

7  Debtor's business and the industry as a whole.  The Stalking Horse Bidder also conducted

8  extensive negotiations with DFT with respect to continued occupancy of the East Coast data

9  centers and has not only reached agreement with DFT, but in connection therewith, obtained

10  DFT's agreement to negotiate with any overbidder.  Based on all the foregoing, the Court should

11  enter the sale procedures order attached hereto as Exhibit 1.

## II.

### SALES PROCEDURES MAY BE APPROVED UNDER LBR 6004-1(b)

14  Sales procedures may be set pursuant to the procedures contained in LBR 6004-1(b) which

15  states as follows:

> **(b) Motion for Order Establishing Procedures for the Sale of Estate Property.**
> (1) Timing of Hearing. A hearing on a Motion to Establish Procedures for the Sale
> of the Estate's Assets ("Sale Procedure Motion") may be scheduled on not less than
> 7 days notice to applicable parties, unless an order setting hearing on shortened
> notice is obtained under LBR 9075-1(b).
> (2) Contents of Notice. The notice must describe the proposed bidding procedures
> and include a copy of the proposed purchase agreement. If the purchase agreement
> is not available, the moving party must describe the terms of the sale proposed,
> when a copy of the actual agreement will be filed with the court, and from whom it
> may be obtained. The notice must describe the marketing efforts undertaken and
> the anticipated marketing plan, or explain why no marketing is required. The notice
> must provide that opposition is due on or before 1 day prior to the hearing, unless
> otherwise ordered by the court.
> (3) Service of the Notice and Motion. The moving party must serve the motion and
> notice of the motion and hearing by personal delivery, messenger, telephone, fax,
> or email to the parties to whom notice of the motion is required to be given by the
> FRBP or by these rules, any other party that is likely to be adversely affected by the
> granting of the motion, and the United States trustee. The notice of hearing must
> state that any response in opposition to the motion must be filed and served at least
> 1 day prior to the hearing, unless otherwise ordered by the court.
> (4) Opposition. Any opposition and accompanying memorandum of points and
> authorities and declarations must be filed and served at least 1 day prior to the

hearing, unless otherwise ordered by the court. Documents filed in opposition to the motion must be served by personal delivery, messenger, fax, or email. A judge's copy of the opposition must be served on the judge in chambers in accordance with LBR 5005-2(d).

(5) Scheduling Hearing on the Sale. A date and time for a hearing on the motion to approve the sale itself may be obtained at or prior to the hearing on the Sale Procedure Motion. The hearing must be scheduled, if practicable, no more than 30 days following the hearing on the Sale Procedure Motion.

(6) Break-up Fees. If a break-up fee or other form of overbid protection is requested in the Sale Procedure Motion, the request must be supported by evidence establishing:

(A) That such a fee is likely to enhance the ultimate sale price; and

(B) The reasonableness of the fee.

LBR 6004-1(b).

This Motion complies with LBR 6004-1(b) as follows:

1.  *Time of hearing*. Debtor's Motion has been set on seven (7) days' notice to parties in interest.

2.  *Contents of Notice*. Debtor has served the content of this motion (pages 1-12), with Exhibits 1 and 2, on all creditors listed in the Debtor's schedules and creditors that have filed claims in the estate. Active case participants have received notice by Notice of Electronic Filing concurrently with filing. This Motion: (1) describes the proposed bidding procedures; (2) describes the terms of the sale proposed; (3) confirms that the actual APA will be filed with the court on or before September 1, 2015 and may be obtained from the undersigned Debtor's counsel; and (4) describes the marketing efforts undertaken and the anticipated marketing plan as set forth in Exhibit 2. Finally, the notice of this Motion makes clear that opposition is due on or before 1 day prior to the hearing, unless otherwise ordered by the court.

3.  *Service of the Notice and Motion*. Debtor has served this motion on all creditors listed in the Debtor's schedules and creditors that have filed claims in the estate. Active case participants have received notice by Notice of Electronic Filing concurrently with filing.

4.  *Opposition*. The opposition deadline is set forth herein as 1 day prior to the hearing.

5.  *Scheduling Hearing on the Sale*. Debtor requests that the sale hearing be set on September 24 or 25, 2015.

6.    *Break-up Fees*.  The Netunim APA contemplates a $100,000 break-up fee.

Consequently, the request must be supported by evidence establishing: (A) that such a fee is likely

to enhance the ultimate sale price; and (B) the reasonableness of the fee.  Debtor relies on the

Terwilliger Declaration and the content of the Summary Marketing Report to establish that the

break-up fee will enhance the ultimate sale price and is reasonable under the circumstances.

In In re Hupp Indus., 140 B.R. 191 (Bankr. N.D. Ohio 1992), the court identified seven

factors that it considered in determining whether certain bid protections, including a break-up fee,

were appropriate: (a) whether the fee requested correlates with a maximization of value to the

debtor's estate; (b) whether the underlying negotiated agreement is an arm's-length transaction

between the debtor and the acquirer; (c) whether the principal secured creditors and the official

creditors' committee(s) are supportive of the requested fee; (d) whether the proposed break-up fee

constitutes a fair and reasonable percentage of the proposed purchase price; (e) whether the dollar

amount of the break-up fee is so substantial that it imposes a "chilling effect" on other potential

bidders; (f) the availability of safeguards to protect the debtor's estate; and (g) if unsecured

creditors oppose the break-up fee, whether there is a substantial adverse impact upon such

creditors.  Id. at 194.

The Debtor submits that the break-up fee is appropriate under the circumstances.  Debtor's

expert investment banker fully supports the break-up fee as an integral part of the stalking horse

sale process to maximize interest in the Debtor's assets.  *See*, Exhibit 2.  Next, the break-up fee

enables the Debtor to ensure the sale of the purchased assets to a contractually-committed bidder

at a price the Debtor believe to be fair while, at the same time, providing the Debtor with the

potential of an even greater return to this estate.  Thus, if the break-up fee offered to the proposed

buyer is approved and ultimately Netunim is not the successful bidder, the Debtor and its estate

will have benefited from the higher floor established by the APA.

The APA was an arm's-length negotiation between the purchaser and the Debtor who were

counseled by sophisticated advisors during the negotiation process.  Finally, the Debtor, after

having worked with their legal and financial advisors to fashion the sales procedures, have also

presented the Committee with the APA and the sales procedures offered to the buyer.  The

1   Committee will present its position on the break-up fee to the Court; however, Debtor cannot

2   foresee any adverse impact upon the interests of creditors.

3         Based on all the foregoing, the Court should enter the sale procedures order attached hereto

4   as Exhibit 1.

## II.

## CONCLUSION

7         *Wherefore*, the Debtor respectfully requests that the Court approve the sales procedure

8   order in the form as attached hereto as Exhibit 1 and grant such other and further relief as the

9   Court deems just and proper under the circumstances.

10   Dated:  August 25, 2015                **Respectfully submitted,**

11                               **Law Offices of Paul A. Beck**
                                  **A Professional Corporation**

13                              By *<u>/s/ Lewis R. Landau</u>*
14                              Paul A. Beck
                              Lewis R. Landau
15                              Attorneys for Debtor

### DECLARATION OF PERVEZ P. DELAWALLA

I, Pervez P. Delawalla, do hereby declare:

1.       I am the President and Chief Executive Officer of Net Data Centers Inc., the debtor and debtor in possession in this bankruptcy case (the "Debtor").  I am also a member of the board of directors of the Debtor and its sole shareholder. Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration.

2.       On February 23, 2015, the Debtor filed a voluntary chapter 11 petition.  The Debtor continues to manage and operate its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  On April 24, 2015 an unsecured creditors committee was appointed.

3.       The Debtor is an internet-based data center service provider delivering redundant power, cooling, network connectivity and managed services within its data center locations.  The Debtor provides access to internet-based applications, providing critical file and data storage and related services directly to its customers.  Leading social networks, enterprises, finance, content companies, and communications service providers rely on the Debtor's services for uninterrupted operations to support their applications.  Additional information about the Debtor's operations and management is available on its website at *www.netdatacenters.com*.

4.       Prior to June 30, 2015 the Debtor was a party to 9 unexpired leases of non-residential real property, on which it operates eight (8) data centers, four (4) in New Jersey and Virginia (involving five (5) leases), and four (4) in Los Angeles County (involving three (3) leases), and a corporate office located in El Segundo, California.  The Debtor's various data centers host over 170 of its clients' databases of critical operating data, to which their customers and clients must have continuous, immediate and seamless access at all times, 24 hours a day, 7 days a week.  The Debtor manages the business operations of its data centers, collects customers' service agreement payments, services its customers' needs at each data center location, and pays the expenses of operating and managing the data centers.  The Debtor generates its revenues primarily from its customers' managed service agreements.

5.       The Debtor's customers, in turn, are provided with space and power pursuant to and governed by the Debtor's Master Service Agreements.  Since the Debtor's facility leases were

1    entered into at the height of the data center real estate market approximately 8 years ago, the

2    Debtor's leases with its landlords were all at rates that were significantly higher than current fair

3    market values, and that generated the Debtor's current need for reorganization.

4          6.      As of July 1, 2015 the Debtor rejected its leases with the affiliates of DuPont

5    Fabros Technology, L.P. ("DFT") for its East Coast data centers and Charter Holdings, L.P.

6    ("Charter") for its data center facility located at 1200 W. 7th Street, Los Angeles, California. *See*,

7    ECF # 178. Although the DFT and Charter leases are rejected, valuable Debtor and customer

8    equipment remains on site at the DFT and Charter data centers. Debtor continues to provide

9    services to customers pending arrangements to assign customers and equipment to a new operator

10   at the DFT or Charter facilities or transitioning customers and equipment to Debtor's other

11   facilities. Debtor has entered into agreements with both DFT and Charter to address the period

12   after rejection pending further arrangements. The Court approved Debtor's stipulation with DFT

13   on July 9, 2015. *See*, ECF # 202.

14         7.      The Debtor's ability to transition out of the DFT and Charter facilities and realize

15   fair value from its furniture, fixtures and equipment and other intangible assets relating to the

16   operations of the East Coast data centers (collectively, the "Purchased Assets") is an important

17   component of its overall reorganization. Debtor intends use the proceeds from the sale

18   contemplated by the APA (defined below) to cure its retained leases subject to assumption thereof

19   and fund its overall chapter 11 reorganization. The sale contemplated herein disposes of the

20   Purchased Assets.

21         8.      As mentioned above, the Debtor was a party to four (4) real property leases in

22   respect of its East Coast data centers with the following affiliates of DFT: (1) Whale Ventures,

23   LLC (property located at 101 Possumtown Rd., Piscataway, New Jersey); (2) Fox Properties, LLC

24   (property located at 44521 Hastings Drive, Ashburn, Virginia); (3) Grizzly Ventures, LLC

25   (property located at 44480 Hastings Drive, Ashburn, Virginia); and (4) Lemur Properties, LLC

26   (property located at 1780 Business Center Drive, Reston, Virginia) (collectively "DFT Leases").

27   The DFT Leases were rejected by operation of law on July 1, 2015.

28

9.      The Purchased Assets being sold pursuant to the transaction contemplated by the APA are located within the facilities that were formerly subject to the DFT Leases or otherwise related to the Debtor's operations at such facilities.  Debtor has remained in occupancy of the facilities formerly subject to the DFT Leases pursuant to a Court approved Stipulation re Post-Rejection Transition Period and Payments of Rent and Expenses ("Stipulation") [ECF #199, 202]. However, the Debtor intends to terminate the Stipulation effective upon closing of the sale subject to the auction. To secure occupancy rights, the buyer will be required to negotiate and enter into leases with the DFT affiliates.

10.     On May 11, 2015 the Debtor retained 321 Capital Partners, LLC ("321 Capital") as an investment banker and the Court approved 321 Capital's employment pursuant to order entered June 22, 2015.  See, ECF #s 115, 177.  321 Capital specializes in strategic transactions for data center facilities.  321 Capital thereafter engaged in an extensive marketing effort for the Debtor's East Coast assets as set forth in the Summary Marketing Report a true and correct copy of which is attached hereto as Exhibit 2.  321 Capital's efforts resulted in securing the sale opportunity contemplated herein.

11.     On July 20, 2015 Debtor entered into the Letter of Intent ("LOI") with Blackstreet Capital Holdings ("BCH") a true and correct copy of which is attached hereto as Exhibit 3.  The LOI contemplated a stalking horse transaction whereby an affiliate of BCH, would acquire the Purchased Assets for $2 million subject to various terms and conditions and subject to overbid. The LOI contemplated an August 31, 2015 closing, which was not feasible under the circumstances.

12.     Nonetheless, the parties continued working on an Asset Purchase Agreement ("APA") and the most current form of the APA is attached hereto as Exhibit 4.  The APA contemplates the same transaction as contained in the LOI with Netunim, Inc. as BCH's buyer designee (the "Stalking Horse Bidder").  Debtor anticipates that the executed APA will be in substantially the form as set forth in Exhibit 4.  The APA contemplates a sale of the Purchased Assets for $2 million with and auction (if necessary) and sale hearing to be held on September 24, 2015 and closing to occur promptly thereafter, and in any event by September 30, 2015.

13.     Debtor believes that a sale of the Purchased Assets to the Stalking Horse Bidder or an overbidder is an exercise of sound business judgment and a transaction in the best interests of the estate and creditors.  The transaction allows the Debtor to realize a substantial return on the value of the Purchased Assets, which value is at risk due to the potential for a thirty-day termination notice under the DFT Stipulation.  Debtor will lose substantial asset value if it is forced to remove the tangible Purchased Assets located in the DFT data centers, which it will be compelled to do if DFT terminates the Stipulation.  Moreover, Debtor will enter into a Transition Service Agreement ("TSA") with the Stalking Horse Bidder whereby Debtor will continue to service customers on behalf of the Stalking Horse Bidder.  The TSA also provides for additional consideration to the Debtor.  The transactions contemplated by the APA also enable the Debtor to realize cash proceeds, which will enable it to fund a plan of reorganization around the Debtor's remaining assets.

14.     The proposed bidding procedures set forth in the APA are fair, reasonable and appropriate to maximize the estate's recovery on its East Coast data center assets.  As set forth in the Terwilliger Declaration and the Summary Marketing Report attached hereto as Exhibit 2, the bidding procedures outlined in the APA are based on bidding procedures that 321 Capital has successfully used in past section 363 sales, in which multiple rounds of bidding resulted in significant improvement to the total purchase price.  Per 321 Capital, the initial overbid of $200,000 covers the break-up fee, does not "chill" bidding, while adequately compensating the Stalking Horse Bidder.  Per 321 Capital, subsequent bid increments of $100,000 are in-line with a transaction of this scale and should result in active participation by bidding parties.  Per 321 Capital, given its extensive marketing efforts to date, 321 Capital has already identified the pool of potential bidders that may be interested in participating in the auction sale.  *See*, Exhibit 2 marketing report.

15.     In addition, the Stalking Horse Bidder has undertaken significant efforts in completing its due diligence including, without limitation, conducting a detailed review of the Debtor's financial statements, reviewing Debtor's contracts with customers and vendors of the East Coast data centers, conducting discussions with customers and employees, and analyzing the

viability of the Debtor's business and the industry as a whole.  The Stalking Horse Bidder also conducted extensive negotiations with DFT with respect to continued occupancy of the East Coast data centers and has not only reached agreement with DFT, but in connection therewith, obtained DFT's agreement to negotiate with any overbidder.

16.    On behalf of the Debtor, I believe that the $100,000 break-up fee is appropriate under the circumstances.  Debtor's expert investment banker fully supports the break-up fee as an integral part of the stalking horse sale process to maximize interest in the Debtor's assets.  *See*, Exhibit 2.  Next, the break-up fee enables the Debtor to ensure the sale of the purchased assets to a contractually-committed bidder at a price the Debtor believe to be fair while, at the same time, providing the Debtor with the potential of an even greater return to this estate.  Thus, if the break-up fee offered to the proposed buyer is approved and ultimately Netunim is not the successful bidder, the Debtor and its estate will have benefited from the higher floor established by the APA.

17.    The APA was and is an arm's-length negotiation between the purchaser and the Debtor who were counseled by sophisticated advisors during the negotiation process.  Finally, the Debtor, after having worked with their legal and financial advisors to fashion the sales procedures, have also presented the Committee with the APA and the sales procedures offered to the buyer. The Committee will present its position on the break-up fee to the Court; however, Debtor cannot foresee any adverse impact upon the interests of creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 25th day of August, 2015 at Los Angeles, California.

_____
Pervez P. Delawalla

1                          **DECLARATION OF ERVIN TERWILLIGER**

2 I, Ervin Terwilliger, do hereby declare:

3         1.      I am a partner in 321 Capital Partners, LLC ("321 Capital"). Unless otherwise

4 stated, I have personal knowledge of the facts set forth in this declaration.  321 Capital has been

5 employed as investment bankers for Net Data Centers, Inc. ("Debtor") pursuant to Court approved

6 application and order thereon.  See, ECF #s 115, 177.

7         2.      Attached hereto as Exhibit 2 is a true and correct copy of a Summary Marketing

8 Report I prepared on behalf of 321 Capital.  The statements contained in the Summary Marketing

9 Report are true and correct and accurately reflect 321 Capital's market efforts to date and my

10 opinions concerning the merits of Court approval of the Netunim, Inc. sales procedures order.

11       I declare under penalty of perjury under the laws of the United States of America that the

12 foregoing is true and correct to the best of my knowledge, information and belief.

13       Executed this 25th day of August, 2015 at Los Angeles, California.

14

15

16                                Ervin Terwilliger

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1

**Paul A. Beck** (SBN 79760)
**Lewis R. Landau** (SBN 143391)

2

*lew@landaunet.com*
**Law Offices of Paul A. Beck, APC**

3

13701 Riverside Drive, Suite 701
Sherman Oaks, California 91423

4

Tel: (818) 501-1141; Fax: (818) 501-1241

5

Attorneys for Debtor and Debtor in Possession
Net Data Centers, Inc.

6

7

### UNITED STATES BANKRUPTCY COURT

8

### CENTRAL DISTRICT OF CALIFORNIA

9

### LOS ANGELES DIVISION

10

| | |
|---|---|
| 11    In re | Case No.: 2:15-bk-12690-BB |
| 12    Net Data Centers, Inc., | Chapter 11 |
| 13            Debtor. | **ORDER ESTABLISHING PROCEDURES FOR THE SALE OF ESTATE'S EAST COAST ASSETS** |

11

In re

Case No.: 2:15-bk-12690-BB
Chapter 11

12

Net Data Centers, Inc.,

13

Debtor.

**ORDER ESTABLISHING PROCEDURES
FOR THE SALE OF ESTATE'S EAST
COAST ASSETS**

14

15

Date:          September 1, 2015
Time:        10:00 a.m.

16

Place:        Courtroom 1475; Judge Bluebond
U.S. Bankruptcy Court

17

255 E. Temple Street, 14th Floor
Los Angeles, CA 90012

18

On September 1, 2015 at 10:00 a.m., the Court considered the motion filed by Net Data

19

Centers, Inc. ("Debtor") for entry an order establishing procedures in connection with the sale of

20

Debtor's East Coast assets pursuant to 11 U.S.C. § 363(b) and Local Bankruptcy Rule 6004-1(b)

21

("Motion"). Appearances were made as noted in the record.

22

The Court, findings notice properly given and good cause therefore, hereby **ORDERS** as

23

follows[1]:

24

       1.       The Motion is granted.

25

       2.       The following dates and deadlines regarding competitive bidding are hereby

26

established:

27

28

**20**

a.    **Qualified Bid Deadline**:  Tuesday, September 22, 2015, at 4:00 p.m. (Pacific Time) is the deadline ("Bid Deadline") by which all binding bids must actually be received via email by counsel to Debtor (lew@landaunet.com), counsel to Netunim, Inc. (anoskow@manatt.com and cgrumer@manatt.com) ("Purchaser" or "Stalking Horse Bidder") and Debtor's investment banker 321 Capital Partners, LLC (erv@321capital.com).

b.    **Auction**.  September [24], 2015 commencing at 10:00 a.m. (Pacific time), is the date and time the Auction will commence in in the Courtroom of the Honorable Sheri Bluebond, United States Bankruptcy Judge located in Courtroom 1475, U.S. Bankruptcy Court, 255 E. Temple Street, 14th Floor, Los Angeles, CA 90012.

c.    **Sale Objection Deadline**.  The deadline to object to the Sale transactions and/or the assumption and assignment of the Assumed Contracts or cure amounts related thereto (to the extent a Cure Notice has been filed with the Bankruptcy Court) shall be September 10, 2015 (the "Sale Objection Deadline").

d.    **Sale Hearing**.  Immediately following the Auction, if any, on September [24], 2015 at 10:00 a.m. is the date and time the Sale Hearing will commence in in the Courtroom of the Honorable Sheri Bluebond, United States Bankruptcy Judge located in Courtroom 1475, U.S. Bankruptcy Court, 255 E. Temple Street, 14th Floor, Los Angeles, CA 90012.

3.    The following bid procedures shall govern the submission, receipt and analysis of any bids relating to the sale of the Purchased Assets, and any party desiring to submit a higher or otherwise better offer to purchase the Purchased Assets shall do so strictly in accordance with the terms of the following Bidding Procedures, subject to the terms of the APA:

(a)    Competing offers to acquire the Purchased Assets shall:

---

[1] Defined terms herein shall have the meaning set forth in the Asset Purchase Agreement filed as Exhibit 1 to ECF # tbd.

(i)      be submitted in writing to counsel for Debtor and Stalking Horse Bidder and 321 Capital on or before 4:00 p.m. (Pacific Time) on September 22, 2015 (the "Bid Deadline");

(ii)      provide for an all-cash purchase price to be paid to Debtor that exceeds the Purchase Price herein by at least Two Hundred Thousand Dollars ($200,000);

(iii)      be accompanied by a signed asset purchase agreement in form and substance substantially similar to the APA, together with a redlined, marked copy showing all changes to the APA (the "Competing Agreement");

(iv)      must not be subject to due diligence contingencies or other conditions beyond those imposed by Stalking Horse Bidder; any bidder other than Stalking Horse Bidder shall have an opportunity to review the books and records of the Debtor, provided that such bidder shall execute a non-disclosure agreement in form and substance acceptable to Debtor in Debtor's sole discretion (notwithstanding the foregoing, all due diligence must be completed by all qualified bidders prior to Auction (as defined below);

(v)      remain open until the conclusion of the Sale Hearing (as defined below);

(vi)      contain terms and conditions no less favorable to Debtor than the terms and conditions of the APA;

(vii)      be accompanied by admissible evidence in the form of affidavits or declarations establishing the bidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code;

(viii)      be accompanied by admissible evidence in the form of affidavits or declarations establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(ix)    be accompanied by a cashier's check made payable to the order of Debtor in an amount of One Hundred Thousand Dollars ($100,000.00) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Debtor may retain the Overbidder's Deposit for application as a non-refundable deposit for application towards payment of the Breakup Fee (as defined in Section 3.1(d) below) to Stalking Horse Bidder and the remainder to be applied against the purchase price at the closing of the transaction, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Debtor will promptly return the Overbidder's Deposit to Overbidder;

(x)    be for all of the Purchased Assets; and

(xi)    contain a proposed closing date that is not later than the Closing Date under the APA.

(b)    If any bidders have submitted a qualifying competing bid in accordance with the Sale Procedures Order hereof (each such bid, a "Qualified Bid"), then a public auction of the Purchased Assets (the "Auction") shall be held at 10:00 a.m. (Pacific Time) on September [24], 2015 (or such other date as set by the Bankruptcy Court) at the United States Bankruptcy Court, Courtroom 1475, 14th Floor, Roybal Federal Building and Courthouse, 255 East Temple Street, Los Angeles, California 90012.  The Auction shall be governed by the following procedures:

(i)    All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the sale of the Purchased Assets;

(ii)    Bidding will commence at the amount of the highest Qualified Bid;

**23**

(iii)    Each subsequent bid shall be in increments of no less than $100,000; and

(iv)    For the Stalking Horse Bidder, the Breakup Fee shall be taken into account in the bidding process, such that, for illustration purposes, if the bid is $3,000,000 the Stalking Horse Bidder may bid $2,900,000 cash plus the value of the Breakup Fee to match the $3,000,000 bid.

(c)    A hearing to approve the successful bid at the Auction, or, if no auction is held, to approve the APA, shall be scheduled immediately following the Auction, on the date of the Auction;

(d)    The Breakup Fee in an amount of One Hundred Thousand Dollars ($100,000.00) (the "Breakup Fee") is approved and shall be paid to Stalking Horse Bidder in the event that the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a party other than Stalking Horse Bidder or enters an order confirming a plan of reorganization of Debtor (other than a plan under which Stalking Horse Bidder acquires the Purchased Assets) no later than the closing of the sale of the Purchased Assets to a third party;

(e)    No other bidder for the Purchased Assets shall be entitled to payment of any breakup fee;

(f)    Any entity that fails to submit a timely, conforming Qualified Bid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction or the Sale Hearing; and

///
///
///
///
///
///

**24**

1             (g)     If no timely, conforming Qualified Bid is submitted, Debtor

2 shall request at the Sale Hearing that the Court approve the proposed sale of the

3 Purchased Assets to Stalking Horse Bidder under the APA.

4

5 **IT IS SO ORDERED.**

6                           ###

# EXHIBIT 2

# Summary Marketing Report



EAST COAST OPERATIONS

Ervin Terwilliger & Erik Endler

Three Twenty-One Capital Partners, LLC

8/14/2015

Net Data Centers, Inc.-East Coast Operations                          Summary Marketing Report

# Table of Contents

Purpose of Report ...................................................................................................................................4

Three Twenty-One Capital Partners, LLC ...............................................................................................4

Marketing Efforts ...................................................................................................................................4

Stalking Horse Bidder .............................................................................................................................5

    Support for Break-Up Fee and Bid Procedures...................................................................................6

Additional Marketing Efforts .................................................................................................................6

Summary .................................................................................................................................................7



Net Data Centers, Inc.-East Coast Operations                    Summary Marketing Report

This confidential summary marketing report contains proprietary and confidential information regarding NET DATA CENTERS, INC. (CLIENT). The information contained herein has been prepared by Three Twenty-One Capital Partners, LLC. (321), using information provided by the CLIENT and 321. This report does not purport to contain all material information pertaining to CLIENT and its business.

All questions regarding CLIENT should be directed to:

**Ervin Terwilliger**
**Managing Partner**
**Three Twenty-One Capital Partners, LLC.**
**2205 Warwick Way, Suite 310**
**Marriottsville, MD 21104**
**443-325-5290 x201**
**erv@321capital.com**





**29**

3

## Purpose of Report

The following is a summary of the marketing efforts taken by Three Twenty-One Capital Partners, LLC (321) on behalf of Net Data Centers, Inc. (NDC) to sell all of the assets associated with Net Data Centers' East Coast Operations (ECO).

## Three Twenty-One Capital Partners, LLC

Three Twenty-One Capital Partners, LLC (321) is comprised of a team of professionals with extensive experience marketing distressed businesses, both in and out of bankruptcy. 321's team has completed hundreds of successful transactions, with many of them in Bankruptcy. Ervin Terwilliger, Managing Partner of 321, is a respected and well known insolvency and distressed merger and acquisitions expert, having acted as an expert witness representing many business in Bankruptcy Courts including Pinnacle Films, U.S. Eagle, Tom Jones/Searle, Carolina Internet, Eagle One Golf, Sunstone Components Group and Basic Line, Inc. to name just a few.  Ervin Terwilliger is the lead investment banker on the NDC engagement.  Furthermore, 321 has specific experience in data centers, having successfully aided Carolina Internet in the exit from Chapter 11 Bankruptcy in North Carolina.

## Marketing Efforts

321 Capital was formally engaged upon an order entered to employ 321 as Investment Banker for the Debtors in case No. 2:15-bk-12690-BB by the Honorable Sheri Bluebond on June 22nd, 2015.  Prior to engagement, 321 had met with Pervez Delawalla (owner of NDC) as well as NDC's bankruptcy counsel and NDC's senior staff. 321 discussed the state of the businesses and conducted due diligence on the business.

Due diligence materials were collected and reviewed by 321. Marketing materials (Exhibit A); a Confidential Information Memorandum (Exhibit B); and a secure Data Room with additional supportive information was created and approved by NDC in preparation for the eventual marketing campaign to sell the ECO.

Prior to 321's engagement, NDC was in discussions to sell the ECO with Princeton Managed Hosting (PMH), and believed that a definitive agreement was imminent.  Upon engagement, 321 began open dialog with PMH, affording PMH an exclusive period of time to finish due diligence and enter into a definitive purchase agreement to be presented before the courts as a stalking horse bidder for the ECO.  After several weeks of exclusivity, in person meetings and protracted negotiations, it became clear to 321 that PMH would not able to act as the stalking horse bidder, and thus exclusivity was terminated.

321 launched the marketing campaign for the ECO on the very same day that exclusivity was terminated with PMH.  321 endeavored to reach every data center operation in north America as well as every Private Equity Fund, Private Investor, or Family-Shop currently investing-in or wishing to invest-in data center businesses. Special interest was paid to discuss NDC's ECO with the groups that previously evaluated the Carolina Internet engagement.



321 initiated 1,542 faxes, 3,993 emails and hundreds of calls, as well as online postings to popular deal-sites, 321's website and other social media sources such as LinkedIn. 321 defines a "touch" as a confirmed receipt of marketing materials. 321's marketing campaign for NDC resulted in approximately 6,000 "touches".

321 secured forty-three (43) signed confidentiality agreements with groups wishing to explore the acquisition of NDC's ECO. All groups were afforded access to the Confidential Information Memorandum (CIM-Exhibit B) as well as access to the Level I Data Room. 321 made it very clear that we were seeking a qualified participant to act as the Stalking Horse Bidder in this process.

## Stalking Horse Bidder

321 believes that a stalking horse participant is uniquely critical in the matter of NDC's ECO due to the sensitivity surrounding NDC's customers and the strained relationship with the landlord on all four east-coast data centers (DuPont Fabros Technology, hereafter referred to as DFT). A buyer of the ECO must feel secure that NDC's customers are stable and that the buyer can enter into a viable lease with the landlord. It was not practical to have multiple parties enter into these negotiations with DFT, nor was it wise to subject the customer-base to multiple rounds of diligence calls with different potential buyers.

Lastly, NDC's customers have the highest imaginable requirements for up-time and access. Mission critical processes run through NDC's four data centers and customers cannot have a second of interrupted service. NDC uses a custom software system to field service requests and some of the key employees to operate the ECO will remain with NDC, post-transaction. These high-service requirements and forward looking reliance (albeit temporary) on NDC's staff make the negotiation and execution of a Transition Services Agreement equally paramount to the deal.

The establishment of a qualified stalking horse bidder provided the opportunity to have one, sophisticated and qualified party, vet the customer relationships, negotiate the series of four leases with DFT as well as negotiate an Asset Purchase Agreement and a Transition Services Agreement. The extensive negotiation and diligence required the stalking horse bidder to expend considerable time, effort and money, with no guarantee that the stalking horse bidder would be the ultimate buyer. The estate, and thus the creditors, were receiving significant benefit by virtue of the stalking horse bidders' actions.

It is for the aforementioned reasons that 321 made securing a qualified stalking horse bidder the primary goal of our initial round of marketing. A deadline was set for parties wishing to secure the stalking horse position. All parties were required to supply a letter of intent, proof of financial capacity and a refundable good faith deposit.

After multiple rounds of negotiations and discussions, Blackstreet Capital (http://www.blackstreetcapital.com) emerged as the only group able to meet all requirements, and was thus chosen as the proposed, stalking horse bidder. Blackstreet was afforded an exclusive period to finalize diligence (including direct conversations with DFT and NDC's customers), finalize purchase agreements and enter into leases with DFT (pending a successful acquisition of the ECO).


THREE TWENTY-ONE
CAPITAL PARTNERS

## Support for Break-Up Fee and Bid Procedures

321 always envisioned the process to sell NDC's ECO as a two-step process, due to the deal's heavy dependence on multiple contract negotiations (APA, TSA & Leases) and the required customer diligence. 321 needed to provide a stalking horse bidder with enticement and exclusivity to diligence and negotiate contracts, while vetting customers. Furthermore, extensive costs to conduct diligence and negotiate contracts were required of the stalking horse bidder, with no guarantee that they would be the ultimate winner at auction. 321 proposed, and Blackstreet Capital agreed, that $100,000 was a reasonable break-up fee and sufficient enticement for the stalking horse bidder.

It is the professional opinion of 321 that a $100,000 break-up fee is justified by the combination of benefit to the estate and reasonableness of the amount, given the work required of Blackstreet prior to entering into a definitive agreement. Also, it should be noted that Blackstreet is not receiving expense reimbursement beyond the $100,000 break-up fee. The break-up fee is being recouped through the initial overbid, as stated in the bidding procedures. A customary 3% break-up fee does not suffice in this situation and should not be used as the benchmark for all of the aforementioned reasons.

The uncertainty surrounding DFT's position on the leases as well as the uncertainty of customer retention acted as value suppressors on this opportunity. Now that the Stalking Horse has helped to "shed light" on the lease program(s) available and vetted the customers, we anticipate reaching the true value of these assets at auction. 321 believes that the value returned to the estate will far outweigh the $100,000 break-up fee.

The bidding procedures outline provided to NDC's bankruptcy counsel are based on bidding procedures that 321 has successfully used in past §363 sales, in which multiple rounds of bidding resulted in significant improvement to the total purchase price. The initial overbid of $200,000 covers the break-up fee, does not "chill" bidding, while adequately compensating the stalking horse bidder. Subsequent bid increments of $100,000 are in-line with a deal of this scale and should result in active participation by bidding parties.

## Additional Marketing Efforts

321 had regular and productive direct communications with DFT during the selection of the stalking horse bidder. DFT supplied 321 with a nondisclosure agreement specific to their leases (DFT NDA) to be provided to all potential bidders. 321 sent the DFT NDA to the 43 participants that executed the NDC confidentiality agreement followed by calls to each potential buyer. Twenty-two groups executed DFT's NDA, and were supplied with a standard set of lease terms (lease package), acceptable to DFT, for the east coast facilities.

The lease package allowed potential bidders the opportunity to create financial models, and thus, further diligence the opportunity. 321 also opened up a Level II Data Room with more specific information to groups that executed the NDA with DFT. 321 continued to disseminate due diligence materials to other prospective over-bidders while Blackstreet Capital finalized diligence and documentation necessary to be filed as the stalking horse bidder.



Net Data Centers, Inc.-East Coast Operations                    Summary Marketing Report

321 communicated with all potential bidders that a stalking horse bidder had been selected, and that we welcomed and would continue to facilitate bidding at auction.  321 is currently in deep conversation with additional parties that have shown interest in participating once the sales motion is filed and the various deal documents and timelines are made public.

Upon filing of the sales motion and bidding procedures, 321 will use email, fax, phone and web-posting to inform the 43 parties that previously signed an NDC confidentiality agreement of the timeline and procedures for participating in the auction.  321 plans to send all potential bidders a package including APA, TSA and Leases for redline as well as bid requirements in an effort to drive as much participation as possible. Furthermore, 321 will notice the entire population of prospects contacted in the first wave of the marketing campaign (approximately 4,000 groups), of the pending sale and opportunity to purchase NDC's ECO as well as make public posts referencing the pending sale via web and social media outlets.  321 will continue to actively coordinate participation and solicit overbids.

321 is informed that the auction sale is schedule to be set approximately three weeks after an anticipated August 25, 2015 approval of bid procedures.  In view of 321's efforts to date, this three week period is reasonably sufficient, given that bidding interest in NDC's ECO has already been established through a robust marketing effort.  321 has identified no less than 22 qualified and sophisticated participants with enough due diligence materials and persisting interest to meet the requirements of over-bidder, as specified in the bidding procedures.

## Summary

321 believes that all of the necessary pieces are present to foster a competitive bidding environment for the sale of NDC's ECO.  321 believes that the single most important aspect that will spur competitive bidding, and the ultimate highest and best outcome available from the sale of NDC's ECO, is the stalking horse bidder and pre-negotiated purchase and lease documents.  The proposed bidding procedures are designed to entice, not "chill" bidding, and the APA, TSA and Lease(s) give bidders a clear framework for which they can base financial modeling, and ultimately, bidding.

Twenty-two groups have signed 2 different confidentiality agreements, reviewed 2 levels of data rooms and continue to inquire on this opportunity.  The submitted sales motion, bidding procedures and accompanying documents constitute the missing pieces needed for these groups to make the final decision to move forward with an overbid.  Three Twenty-One Capital Partners strongly recommends that Blackstreet Capital be approved by the court as the stalking horse bidder for the East Coast Operations of Net Data Centers, Inc. Furthermore, 321 will do everything in our power to drive competitive overbids to secure the highest and best return to all parties in interest.



Net Data Centers, Inc.-East Coast Operations                    Summary Marketing Report

---

I am available for questioning and/or testimony in support of this Summary Marketing Report.

**Respectfully,**

Ervin M. Terwilliger
**Ervin M. Terwilliger**
**Managing Partner**
**Three Twenty-One Capital Partners, LLC.**
erv@321capital.com
443-325-5290 ext. 201



**34**    8

# EXHIBIT 3

# BLACKSTREET CAPITAL

## HOLDINGS

5425 Wisconsin Ave, Suite 701 | Chevy Chase, MD 20815 | Telephone: 240-223-1330 | Facsimile: 240-223-1331

July 20, 2015

Mr. Ervin Terwilliger
321 Capital Partners
2205 Warwick Way
Suite 310
Marriottsville, MD 21104

Dear Erv:

We are pleased to present, on behalf of ND Holdings, Inc. ("NDHI" or "Buyer"), an affiliate of Blackstreet Capital Holdings, LLC ("BCH"), an offer to acquire all of the East Coast assets (as defined below) of Net Data Centers, Inc. (the "Company") through a Section 363 bankruptcy sale (the "Transaction") in the Company's pending Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Central District of California (Los Angeles Division) (the Bankruptcy Court"), "In re Net Data Centers, Inc.," Debtor, Chapter 11 Case No. 2:15-bk-12690-BB (the "Bankruptcy Case"), in which NDHI will be named the "stalking horse," all to be set forth more fully in a definitive asset purchase agreement.

With deep experience in purchasing businesses out of bankruptcy through prior entities, we believe that we are the right type of buyer who can give the debtor, secured creditors and unsecured creditors the least amount of transaction risk. We specialize in investing in companies undergoing change and have the expertise to turn the business around and make it a success for the employees, customers, landlord and vendors. Some examples of relevant transactions we have completed in the past through prior entities and employers include:

- **AWE Learning**, a Pennsylvania-based $8 million manufacturer and distributor of early child learning stations to libraries, child centers and schools, purchased in a 363 Bankruptcy Sale.
- **Chadwicks**, a Massachusetts-based $100 million direct marketer of women's apparel, provided DIP Financing and purchased the assets in a 363 Bankruptcy Sale.
- **Jackson & Perkins**, a South Carolina-based $40 million manufacturer, distributor, and marketer of roses, plants and other related horticultural items, purchased in a 363 Bankruptcy Sale.
- **Thermoview**, a Louisville-based $65 million manufacturer and installer of replacement doors and windows, purchased in a 363 Bankruptcy Sale.

We would work hard to close this transaction as expeditiously as possible. We would expect to agree on an asset purchase agreement within 7 days of the mutual execution of this offer letter and seek Bankruptcy Court approval of the bidding procedures and stalking horse protections in the following 7 days. We would expect the auction to be held by August 31, 2015 and to close immediately thereafter. We assume that both Buyer and Seller will make their best efforts to move through this process as quickly and expeditiously as possible. We will close on the terms herein and we believe that this is a very straightforward transaction. With this in mind, we have tried to highlight the salient business terms that would be present in our investment so that there are no surprises when we begin documenting the deal. Our proposal is, therefore,  as follows:

**Proposed Transaction:** NDHI would be named "Stalking Horse" and would bid to acquire certain of the assets of the Company, described as follows: the Company's four East Coast data centers, i.e., IAD1 (Ashburn, VA), IAD3 (Reston, VA), IAD4 (Ashburn, VA), and EWR1 (Piscataway, NJ) (collectively the "East Coast Data Centers") for a total cash consideration of $2.0 million (the "Purchase Price"). Within 24 hours of the signing of this offer letter the Buyer will submit a deposit of $75,000 to be held in escrow by Manatt, Phelps & Phillips, LLP with evidence of such deposit being provided to the Seller. To the extent an asset purchase agreement is not signed within 7 days of the mutual execution of this offer letter, the deposit will be immediately returned to the Buyer. To the extent an asset purchase agreement is entered between Buyer and Seller, the deposit will be applied to the purchase price paid for the East Coast Assets of Net Data Centers, Inc. or the deposit will be returned within 48 hours to the Buyer following the selection of a competing bidder at the bankruptcy auction or the failure of the auction to take place by September 1, 2015.

NDHI's offer also includes the following conditions:
- **Initial Overbid:** Qualifying overbids must be equal to or greater than the Minimum Overbid plus Break-Up

**36**

Fee (as defined below).

- **Minimum Overbid:** A requirement that the cash purchase component of other bidders' offers exceed the Purchase Price by a minimum of $100,000.
- **Deposit:** A requirement that other bidders submit a deposit of at least $100,000 in order to be a competing bidder.
- **Break-up Fee:** A break-up fee equal to $100,000 (the "Break-up Fee") payable to Blackstreet Capital Holdings, LLC ("BCH") in the event that a competing bidder is selected, to be paid within 24 hours following the entry of a final, nonappealable order of the Bankruptcy Court approving the selection of the competing bid.
- **Lease Negotiation:** This offer is contingent on the Buyer entering into new lease arrangements for each of the four East Coast data centers, i.e., IAD1 (Ashburn, VA), IAD3 (Reston, VA), IAD4 (Ashburn, VA) and EWR (Piscataway, NJ) (collectively the "East Coast Data Centers") with rent, CAM and power usage terms that are acceptable to the Buyer.

**Acquired Assets:** This offer assumes that Buyer will purchase all assets related to the East Coast Data Centers, which include but are not limited to cash, accounts receivable, inventory, prepaid assets, licenses, fixed assets, customer contracts, intellectual property, and all other assets used in the business of the East Coast Data Centers, save and except for the Company's IP address space within the East Coast Data Centers that belongs to the Company and not to its customers or to its landlord, DuPont Fabros Technology, LLC or any of its affiliates (collectively, "DuPont"). BCH agrees to come to terms mutually acceptable in reference to the Company's ongoing access to EMC backup hardware (collectively the "Acquired Assets"). It is our assumption that the Seller will assign or transfer all revenue producing contracts to the Buyer.

**Excluded Liabilities:** The Purchase Price assumes that Buyer will not assume any pre-petition or post-petition liabilities in the Transaction, and that the Acquired Assets will be free and clear of liens, claims and interests. The Purchase Price also assumes there are no cure costs related to contracts that need to be assigned to be Buyer. To the extent there are any cure costs, it will reduce the Purchase Price dollar-for-dollar.

**Working Capital:** There will be no working capital adjustment.

**Financing:** There will be no financing contingency. Blackstreet Capital Holdings has firm capital commitments from a series of domestic and international investors. The funding comes simply from sending the investors a letter and the funds are wired within 48 hours.

**Employees:** The Buyer would look to hire substantially all employees that work at the New Jersey and Virginia data centers acquired upon purchasing the assets of the business.

**Representations and Warranties:** The definitive purchase agreement will have customary representations and warranties for a bankruptcy transaction of this type.

**Timing:** We would look to sign this letter of intent as soon as possible. We would expect to agree on an asset purchase agreement within 7 days of signing this offer letter and seek approval of the bidding procedures and stalking horse protection in the following 7 days. We expect the auction to occur no later than August 31, 2015 and to close immediately thereafter. We assume that both Buyer and Seller will make the best efforts to move through this process as quickly and expeditiously as possible.

**Approvals:** No special approvals from BCH are needed for this Transaction.

**Due Diligence:** Buyer's remaining due diligence will be confirmatory in nature and will consist of the following:

- Business: Two or three BCH personnel will conduct confirmatory due diligence and site visits with management. In addition, Buyer shall be given the opportunity to call the top 10 customers of the Company's East Coast Data Centers, following introductions made by the Company.  Contact persons:
    - Lawrence Berger (240) 223-1311
    - Jonathan Tipton (240) 223-1345
    - Stephen Crawford (240) 223-1339
- Legal: Manatt, Phelps & Phillips, Buyer's legal counsel will review any outstanding legal documents and agreements relevant to the transaction:

3

**37**

- o   Alan Noskow (202) 457-5331
- Accounting: Todres & Company, Buyer's accountant, will spend 2-3 days at the Company reviewing the financial records and accounting processes as well as perform final review on audits and tax returns. Contact person:
  - o   Michael Todres (516) 997-3232
- Insurance: Hauser Capital Markets, Buyer's insurance broker and consultant, will ensure that the new entity is covered sufficiently at Closing. Contact person:
  - o   Paul Swanson (513) 936-7372
- Benefits: Meltzer Financial Services, Buyer's health insurance consultant, will review the existing benefits plans. Contact person:
  - o   Jack Abel (301) 581-7300
- Industry: We are comfortable with our understanding of the industry and would not require the services of any consulting firm to assist on industry diligence.

**Background on Buyer:** BCH's management team has deep experience purchasing companies that are in out-of-favor industries, involve complex structuring and/or possess difficult historical financial results. Since 2003, members on BCH's management team led the acquisition of the following businesses through prior affiliates:

- Distinctive Apparel, a $100 million Internet and catalog retailer of women's apparel
- Swisher Mower, a $35 million manufacturer of lawn and garden equipment
- Scrubs AC, a $40 million Internet retailer of medical uniforms
- Bijoux Nouveau, a $30 million designer, distributor, and retailer of affordable apparel and fashion accessories
- Picture People, a $100 million operator of high-end, mall-based portrait photography studios
- Houston Harvest, a $90 million manufacturer of (seasonal) popcorn tins and food gift items sold primarily through Wal-Mart and Target
- AlphaGraphics, a franchisor of 280 business centers providing print and marketing services
- PJCOMN, an 84 unit, $55 million Papa John's franchisee in Colorado and Minnesota
- Pasta Pomodoro, a 24 unit, $30 million Italian casual dining chain
- Western Capital Resources, an $18 million cash advance loan and prepaid wireless provider
- iMarketing Solutions Group, a $50 million provider of on- and off-line integrated marketing solutions and fundraising services
- Jerry's, a franchisor of 53 sub and pizza casual dining restaurants
- Freelotto, a $10 million on-line sweepstakes business

**Exclusivity:** Upon execution of this agreement for a period of seven (7) days starting on the first business day following your agreement with the terms of this letter, the Buyer and BCH will work exclusively with the Company to enter into a definitive asset purchase agreement.

**Expiration of Offer:** This offer will expire at 11:59 pm PST on Monday, July 20, 2015 unless executed by both Company and Buyer.

**Not Binding Commitment:** Nothing herein is intended to, or shall, create any rights in favor of either party and nothing herein (other than the provisions entitled Exclusivity and Not Binding Commitment, each of which is intended to, and shall, be legally binding) is intended to, or shall, be legally binding. A legally binding obligation regarding the purchase will arise only upon the execution of a mutually acceptable definitive asset purchase agreement.

4

**38**

We look forward to working with you on this transaction.

Agreed to and accepted by,

Blackstreet Capital Holdings, LLC                    Net Data Centers, Inc.


Lawrence Berger                                      Name: Pervez P. Delawalla
Chief Investment Officer                             Title: President & CEO

cc:    Alan Noskow, Manatt, Phelps & Phillips
       Jonathan Tipton, BCH
       Stephen Crawford, BCH
       Vicki Ingram, BCH

# EXHIBIT 4

**ASSET PURCHASE AGREEMENT**

**between**

**NET DATA CENTERS, INC.**

**and**

**NETUNIM, INC.**

**DATED AS OF AUGUST__, 2015**

## TABLE OF CONTENTS

**Page**

ARTICLE 1 PURCHASE AND SALE ........................................................................... 2

ARTICLE 2 DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS;
     ASSUMPTION OF LIABILITIES ........................................................ 2

     Section 2.1.     Purchased Assets. ............................................................ 2
     Section 2.2.     Excluded Assets. .............................................................. 3
     Section 2.3.     Assumed Liabilities; Excluded Liabilities. ...................... 3

ARTICLE 3 BANKRUPTCY COURT APPROVAL ...................................................... 5

     Section 3.1.     Entry of Sale Procedures Order. ..................................... 5
     Section 3.2.     Entry of Order Approving Sale. ...................................... 7
     Section 3.3.     Certain Bankruptcy Undertakings by Seller. .................. 9

ARTICLE 4 INSTRUMENTS OF TRANSFER AND ASSUMPTION ........................... 9

     Section 4.1.     Transfer Documents. ....................................................... 9
     Section 4.2.     Assignment and Assumption Documents ......................... 9

ARTICLE 5 CONSIDERATION; ALLOCATION ......................................................... 9

     Section 5.1.     Consideration .................................................................. 9
     Section 5.2.     Allocation of Consideration ................**Error! Bookmark not defined.**
     Section 5.3.     Prorations ....................................................................... 12

ARTICLE 6 CLOSING .............................................................................................. 10

     Section 6.1.     Closing Date .................................................................. 10

ARTICLE 7 SELLER'S REPRESENTATIONS AND WARRANTIES ................................ 11

     Section 7.1.     Organization, Qualification and Corporate Power ........... 11
     Section 7.2.     Authorization, Execution and Delivery of Agreement and
                    Transaction Documents. ................................................. 11
     Section 7.3.     Title to and Condition of Assets. .................................... 11
     Section 7.4.     Liabilities.. .................................................................... 11
     Section 7.5.     Corporate Records.. ....................................................... 12
     Section 7.6.     Legal Proceedings ......................................................... 12
     Section 7.7.     Real Property.. ............................................................... 12
     Section 7.8.     No Violation of Laws or Agreements .............................. 12
     Section 7.9.     Employee Benefits; ERISA Matters ................................ 12
     Section 7.10.    Labor Matters ................................................................ 14
     Section 7.11.    Transferred Intellectual Property .................................... 14
     Section 7.12.    No Defaults ................................................................... 14
     Section 7.13.    Environmental Matters ................................................... 14
     Section 7.14.    Brokers ......................................................................... 14
     Section 7.15.    Permits ......................................................................... 15

-i-

# TABLE OF CONTENTS
(continued)

**Page**

Section 7.16.     Insurance .................................................................................. 15
Section 7.17.     Taxes; Tax Returns .................................................................. 15
Section 7.18.     Financial Statements ............................................................... 16
Section 7.19.     Related Party Transactions. ................................................... 16
Section 7.20.     Compliance with Law .............................................................. 16
Section 7.21.     No Other Agreements. .............................................................. 17
Section 7.22.     Material Misstatements Or Omissions ................................... 17

ARTICLE 8 PURCHASER'S REPRESENTATIONS ............................................ 17

Section 8.1.      Organization; Qualification and Corporate Power. ........... 17
Section 8.2.      Authorization, Execution and Delivery of Agreement and
                  Transaction Documents ......................................................... 17
Section 8.3.      Brokers ..................................................................................... 18
Section 8.4.      Funding ..................................................................................... 18

ARTICLE 9 SELLER'S AND PURCHASER'S COVENANTS AND AGREEMENTS ......... 18

Section 9.1.      Conduct of Business ................................................................ 18
Section 9.2.      Mutual Covenants ................................................................... 18
Section 9.3.      Filings and Authorizations .................................................... 19
Section 9.4.      Access to Information. ............................................................ 19
Section 9.5.      Public Announcement ............................................................. 20
Section 9.6.      Taxes ......................................................................................... 20
Section 9.7.      Consents ................................................................................... 20
Section 9.8.      Good Faith Efforts ................................................................. 21
Section 9.9.      Employees ................................................................................ 21
Section 9.10.     Key Employees .................................**Error! Bookmark not defined.**
Section 9.11.     Further Assurances................................................................. 21
Section 9.12.     Survival of Representations and Warranties ....................... 22
Section 9.13.     "AS IS" Transaction; Disclaimer of Implied Warranties ................. 23

ARTICLE 10 CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO
           CLOSE.................................................................................................. 23

Section 10.1.     Accuracy of Representations and Warranties; Performance of
                  this Agreement ...................................................................... 23
Section 10.2.     Authorizing Resolutions ........................................................ 24
Section 10.3.     Officer's Certificate ............................................................... 24
Section 10.4.     Bill of Sale; Assumption Agreement ..................................... 24
Section 10.5.     Bankruptcy Matters................................................................ 24
Section 10.6.     Consents ................................................................................... 24
Section 10.7.     No Material Adverse Change or Destruction of Property.. .............. 24
Section 10.8.     Outside Closing Date .........................**Error! Bookmark not defined.**
Section 10.9.     Key Employee Agreements ...............**Error! Bookmark not defined.**

-ii-

## TABLE OF CONTENTS

(continued)

**Page**

Section 10.10.    Real Property Leases..........................**Error! Bookmark not defined.**

ARTICLE 11 CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE....... 24

Section 11.1.    Accuracy of Representations and Warranties; Performance of this Agreement ..................................................................... 24

Section 11.2.    Authorizing Resolutions .................................................... 25

Section 11.3.    Assumption Agreement. .................................................... 25

Section 11.4.    Bankruptcy Matters............................................................ 25

Section 11.5.    Outside Closing Date .........................**Error! Bookmark not defined.**

ARTICLE 12 INDEMNIFICATION........................ **ERROR! BOOKMARK NOT DEFINED.**

**[This Article intentionally omitted.]**.............................**Error! Bookmark not defined.**

ARTICLE 13 TERMINATION ................................................................................ 25

Section 13.1.    Breaches and Defaults; Opportunity to Cure ..................................... 25

Section 13.2.    Termination........................................................................... 25

ARTICLE 14 BROKERS' FEES............................................................................. 26

ARTICLE 15 MISCELLANEOUS ......................................................................... 26

Section 15.1.    Additional Instruments of Transfer................................................. 26

Section 15.2.    Notices .................................................................................. 27

Section 15.3.    Expenses ................................................................................ 28

Section 15.4.    Governing Law. ....................................................................... 28

Section 15.5.    Assignment.. ........................................................................... 28

Section 15.6.    Successors and Assigns............................................................... 28

Section 15.7.    Amendments; Waivers............................................................... 28

Section 15.8.    Entire Agreement ..................................................................... 28

Section 15.9.    Counterparts ........................................................................... 29

Section 15.10.    Severability ........................................................................... 29

Section 15.11.    Section Headings .................................................................... 29

Section 15.12.    Interpretation.......................................................................... 29

Section 15.13.    Reasonable Access to Records and Certain Personnel.. ................... 29

Section 15.14.    Third Parties............................................................................ 30

Section 15.15.    Definitions.............................................................................. 30

203202841.8

-iii-

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of August __, 2015 (the "Execution Date") by and between NET DATA CENTERS, INC., a California corporation, as Debtor and Debtor-in-Possession ("Seller") under Case No.2:15-bk-12690-BB (the "Bankruptcy Case") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"), and NETUNIM, Inc., a Delaware corporation ("Purchaser").  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in Section 15.15 of this Agreement.

### R E C I T A L S

WHEREAS, on February 23, 2015 (the "Petition Date"), Seller commenced the Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court; and

WHEREAS, Seller is an internet-based data center service provider (i) delivering redundant power, cooling, network connectivity and managed services within its data center locations; (ii) providing access to internet-based applications; and (iii) providing critical file and data storage and related services directly to its customers, which include leading social networks, enterprises, finance, content companies, and communications service providers, all of whom rely on the Seller's services for uninterrupted operations to support their applications (such businesses, as presently conducted by Seller, shall be collectively referred to herein as the "Business"), as Debtor and Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (defined below), together with the Assumed Liabilities of Seller (defined below) upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, the Purchased Assets will be sold pursuant to a Sale Order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain executory contracts and service agreements, unexpired leases of equipment and liabilities thereunder, under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement; and

WHEREAS, all of the obligations of the parties under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article 3 hereof.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE 1
## PURCHASE AND SALE

Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, Seller agrees to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase from Seller at the Closing, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, claims or interests of any type or nature, whether known or unknown, of Seller or any other party.

# ARTICLE 2
## DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1.    Purchased Assets.   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery from Seller, all of Seller's right and title to and interest in and to the business assets, properties, and rights (contractual or otherwise) owned by the Seller to the extent associated with the Seller's East Coast Data Centers (as defined below), excluding the Excluded Assets (defined below) (the "Purchased Assets").  The Purchased Assets shall consist of all of Seller's right, title and interest in and to the following:

(a)    All equipment, machinery or other tangible personal property listed on Schedule 2.1(a) hereto and any warranty rights or claims associated therewith;

(b)    All leases of equipment, machinery or other tangible personal property listed on Schedule 2.1(b) hereto (the "Personal Property Leases");

(c)    All contracts, agreements, contract rights, license agreements, customer contracts, distribution agreements, franchise rights and agreements, purchase and sales orders (if any), quotations and executory commitments, instruments, royalty agreements, third party guaranties, indemnifications, arrangements and understandings, whether oral or written, to which Seller is a party (whether or not legally bound thereby) and which relate to the Purchased Assets and the operation of the Business, to the extent listed on Schedule 2.1(c) hereto (the "Assumed Contracts");

(d)    All of Seller's rights with respect to the possession and occupancy of Seller's four (4) East Coast data centers, i.e., the data centers known and referred to as IAD1 (Ashburn, VA), IAD3 (Reston, VA), IAD4 (Ashburn, VA), and EWR1 (Piscataway, NJ) (collectively the "East Coast Data Centers") as set forth on Schedule 2.1(d) hereto, together with all buildings, structures, installations, fixtures and all other leasehold improvements, appurtenant thereto or situated thereon and all other rights, interests and appurtenances of Seller pertaining thereto;

(e)    Cash and accounts receivable relating to the East Coast Data Centers, as set forth on Schedule 2.1(e) hereto ;

2

**46**

(f)      All prepaid items and or expenses which relate to the Assumed Contracts, the Personal Property Leases, or East Coast Data Centers; and

(g)      All books and records related to the Purchased Assets including customer or client lists, files, documentation, records and the related documentation listed on Schedule 2.1(g) hereto.

Section 2.2.      Excluded Assets.  Except as expressly set forth in Section 2.1, the Purchased Assets shall not include any of the assets, properties and/or rights of Seller (collectively, the "Excluded Assets").  The Excluded Assets shall include, without limitation:

(a)      Any Contracts that are not Assumed Contracts (the "Excluded Contracts");

(b)      All of Seller's insurance policies relating to the Business of the Purchased Assets, subject to any claims of co-insureds, including, without limitation, all rights to receive proceeds of insurance policies, any outstanding claims thereunder and all rights of offset, counterclaims and insurance coverage thereunder (collectively, the "Insurance Policies"), which such Insurance Policies are as set forth in Schedule 2.1(c) hereto (showing as to each policy or binder the carrier, policy or binder the carrier, policy number, coverage limits, expiration dates, annual premiums and a general description of the type of coverage provided); and

(c)      All of Seller's right, title and interest in and to the Equipment described on Schedule 2.2(d) subject to Seller entering into a management and access agreement with Purchaser with respect to such Equipment.

Section 2.3.      Assumed Liabilities; Excluded Liabilities.

(a)      At the Closing, Purchaser shall assume and agree to perform and discharge only the following Liabilities of Seller to the extent not previously performed or discharged, and no others: (i) all Liabilities of Seller which first accrue and are to be performed from and after the Closing under the Assumed Contracts and the Personal Property Leases, which relate to periods of time on or after the Closing Date, and (ii) liabilities and obligations relating to and arising from Purchaser's operation of the Purchased Assets after the Closing (items (i) and (ii) are collectively referred to herein as the "Assumed Liabilities").

(b)      Other than the Assumed Liabilities, Purchaser shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or liabilities of Seller or relating to the Purchased Assets (or which may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets as a matter of law) of any kind or nature, fixed or contingent, known or unknown, including, without limitation, the following (collectively, the "Excluded Liabilities"):

(i)      any Liability of Seller in respect of any Taxes arising or accruing prior to the Closing Date;

(ii)      any Liability of Seller under any contract or lease that is not an Assumed Contract or Assumed Personal Property Lease;

3

**47**

(iii)     any Liability of Seller which first accrued and was to be performed prior to the Closing under the Assumed Contracts and the Personal Property Leases or which otherwise relate to periods of time prior to the Closing Date;

(iv)     any Liability relating to and arising from Seller's operation of the Purchased Assets prior to the Closing;

(v)     any Liability of Seller arising out of or resulting from its compliance or noncompliance with any Law;

(vi)     any Liability of Seller arising out of or related to any Legal Proceeding against it or any Legal Proceeding which has an adverse effect on the Purchased Assets and which was or could have been asserted on or prior to the Closing Date or to the extent the basis of which arose or accrued on or prior to the Closing Date;

(vii)     any Liability of Seller for any indemnification obligations pursuant to any claim or notice received or required to be received prior to the Closing Date with respect to any Purchased Assets;

(viii)     any Liabilities arising under or in connection with any Employee Plans of, or maintained or required to be maintained by, Seller;

(ix)     any Liability pursuant to any personal guaranty or indemnity provided by any officer, director, principal, owner or other party related to Seller;

(x)     any Liability of Seller to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement; and

(xi)     any Liability that is not an Assumed Liability.

(c)     On or before the date that is two (2) business days prior to the Closing Date, Purchaser shall provide in writing to Seller an update to Schedule 2.1(c), to the extent applicable, which shall include a list of the Assumed Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date.  The Assumed Contracts shall be assumed by Seller and assigned to Purchaser in accordance with the requirements of Section 365 of the Bankruptcy Code, and Seller shall be obligated to pay, on the Closing Date, all amounts needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of any such Assumed Contracts ("Cure Amounts"). Purchaser shall provide adequate assurance of future performance of the Assumed Contracts as may be required by the Bankruptcy Court.

(d)     Purchaser acknowledges that the Sale Order will authorize the assumption and assignment of the Assumed Contracts without the requirement of any consent by the parties thereto.  To the extent any Assumed Contract is not assumable and assignable by Seller to Purchaser under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Seller and Purchaser shall use their commercially reasonable efforts prior to Closing to obtain all such required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without conditions that are materially

4

**48**

adverse to Purchaser) (the "Required Consents"). All such Required Consents shall be in writing and executed counterparts thereof shall be delivered to Purchaser on or before the Closing Date. If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Purchaser would not receive all such rights, Seller shall use its reasonable best efforts after Closing to provide to Purchaser the benefits under any such Contract or any claim or right, including, without limitation, enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the default or cancellation by such third party or otherwise. Notwithstanding the foregoing, if Seller does not obtain a Required Consent, Purchaser shall not be required to assume (or deemed to have assumed) such Contract.

### ARTICLE 3
### BANKRUPTCY COURT APPROVAL

Section 3.1.    Entry of Sale Procedures Order.  No later than three (3) business days after execution of this Agreement by the parties hereto, Seller shall file a motion in form and substance reasonably satisfactory to Purchaser (the "Sales Procedures Motion") with the Bankruptcy Court seeking, on an expedited basis, entry of an order in form and substance satisfactory to Purchaser which shall include all of the following provisions (the "Sale Procedures Order"):

(a)    Competing offers to acquire the Purchased Assets shall:

(i)    be submitted in writing to Seller and Purchaser and their respective counsel on or before 4:00 p.m. (Pacific Time) on September 22, 2015 (the "Bid Deadline");

(ii)    provide for an all-cash purchase price to be paid to Seller that exceeds the Purchase Price herein by at least Two Hundred Thousand Dollars ($200,000);

(iii)    be accompanied by a signed asset purchase agreement in form and substance substantially similar to this Agreement, together with a redlined, marked copy showing all changes to this Agreement (the "Competing Agreement");

(iv)    must not be subject to due diligence contingencies or other conditions beyond those imposed by Purchaser; any bidder other than Purchaser shall have an opportunity to review the books and records of the Seller, provided that such bidder shall execute a non-disclosure agreement in form and substance acceptable to Seller in Seller's sole discretion (notwithstanding the foregoing, all due diligence must be completed by all qualified bidders prior to Auction (as defined below);

(v)    remain open until the conclusion of the Sale Hearing (as defined below);

(vi)    contain terms and conditions no less favorable to Seller than the terms and conditions of this Agreement;

(vii)    be accompanied by admissible evidence in the form of affidavits or declarations establishing the bidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code;

(viii)    be accompanied by admissible evidence in the form of affidavits or declarations establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(ix)    be accompanied by a cashier's check made payable to the order of Seller in an amount of One Hundred Thousand Dollars ($100,000.00) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Seller may retain the Overbidder's Deposit for application as a non-refundable deposit for application towards payment of the Breakup Fee (as defined in Section 3.1(d) below) to Purchaser and the remainder to be applied against the purchase price at the closing of the transaction, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Seller will promptly return the Overbidder's Deposit to Overbidder;

(x)    be for all of the Purchased Assets; and

(xi)    contain a proposed closing date that is not later than the Closing Date hereunder.

(b)    If any bidders have submitted a qualifying competing bid in accordance with the Sale Procedures Order hereof (each such bid, a "Qualified Bid"), then a public auction of the Purchased Assets (the "Auction") shall be held at 10:00 a.m. (Pacific Time) on September 24 (or such other date as set by the Bankruptcy Court), 2015 at the United States Bankruptcy Court, Courtroom 1475, 14th Floor, Roybal Federal Building and Courthouse, 255 East Temple Street, Los Angeles, California 90012.  The Auction shall be governed by the following procedures:

(i)    All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the sale of the Purchased Assets;

(ii)    Bidding will commence at the amount of the highest Qualified Bid;

(iii)    Each subsequent bid shall be in increments of no less than $100,000; and

(iv)    For the Purchaser, the Breakup Fee shall be taken into account in the bidding process, such that, for illustration purposes, if the bid is $3,000,000 the Purchaser may bid $2,900,000 cash plus the value of the Breakup Fee to match the $3,000,000 bid.

(c)      A hearing to approve the successful bid at the Auction, or, if no auction is held, to approve this Agreement, shall be scheduled immediately following the Auction, on the date of the Auction;

(d)      The Breakup Fee in an amount of One Hundred Thousand Dollars ($100,000.00) (the "Breakup Fee") is deemed approved and shall be paid to Purchaser in the event that the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a party other than Purchaser or enters an order confirming a plan of reorganization of Seller (other than a plan under which Purchaser acquires the Purchased Assets) no later than the closing of the sale of the Purchased Assets to a third party;

(e)      No other bidder for the Purchased Assets shall be entitled to payment of any breakup fee;

(f)      Any entity that fails to submit a timely, conforming Qualified Bid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction or the Sale Hearing; and

(g)      If no timely, conforming Qualified Bid is submitted, Seller shall request at the Sale Hearing that the Court approve the proposed sale of the Purchased Assets to Purchaser under this Agreement.

Section 3.2.      Entry of Order Approving Sale.  Seller shall use its best efforts to obtain entry of on order of the Bankruptcy Court approving the terms of this Agreement (the "Sale Order") as soon as practicable following the mutual execution and delivery of this Agreement and entry of the Sale Procedures Order ("Sale Order Date").  The Sale Order shall be in accordance with the terms of this Agreement, shall be in a form reasonably satisfactory to Purchaser and Seller, and shall, among other things:

(i)      approve and direct the sale and assignment of the Purchased Assets to Purchaser and approve and direct the assumption and assignment of the Assumed Contracts to Purchaser free and clear of all Liens, claims or interests, based on appropriate findings and rulings pursuant to, *inter alia*, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i),  (l) and (n) and the release of Purchaser to any rights otherwise associated with and which may otherwise be to the benefit of any third parties; provided that notwithstanding anything to the contrary in this Agreement, Purchaser shall not be entitled to disapprove the Sale Order by reason of, and Purchaser's (or a successful overbidder's) obligation to consummate the transactions provided for herein shall not be conditioned upon the assumption and assignment of, any Assumed Contracts with respect to which the Bankruptcy Court determines that Purchaser (or a successful overbidder) has failed to provided adequate assurance of future performance pursuant to Section 365 of the Bankruptcy Code;

(ii)      include a direction that Seller allocate in any Chapter 11 plan of reorganization, including a plan of liquidation, the Consideration in the manner established by Section 5.3(a);

7

**51**

(ii)     include a direction that Seller and Purchaser consummate the transactions contemplated hereby in accordance with the terms hereof, including all payments required hereunder, on or before the Outside Date;

(iii)     include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iv)     include a finding that Purchaser is not deemed to be a successor to Seller, to have, *de facto* or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(v)     include a finding that the Consideration  is a fair and reasonable price for the Purchased Assets;

(vi)     include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry;

(vii)     include a finding that any Cure Costs are final and binding upon the applicable counterparty and Seller is authorized and directed to pay such Cure Costs directly from the sale proceeds;

(viii)    include a direction that Purchaser shall be provided with the Qualified Bid and supporting documentation and evidence that such Qualified Bid satisfies the requirements of the Sale Order; and

(ix)     include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing.  Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended.

(b)     Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Central District of California or as otherwise ordered by the Bankruptcy Court.

Notwithstanding anything to the contrary in this Section 3.1 or any other provision of this Agreement, in the event that a Qualified Bid of a third party (an "Alternative Buyer," and the underlying agreement between the Alternative Buyer and Seller, the "Alternative APA") is approved by the Bankruptcy Court at the hearing on the Sale Motion, this Agreement, may become an approved "back-up bid" in Purchaser's sole discretion and pursuant to the Sale Procedures Order.

Section 3.3.        Certain Bankruptcy Undertakings by Seller.

(a)        Seller shall, in good faith, using its commercially reasonable efforts, seek entry of the Sale Order as soon as practicable following the date of this Agreement and take such actions on or before September 25, 2015 (the "Outside Date") as are necessary to consummate the Transactions contemplated by this Agreement in accordance with Sale Order.

(b)        Except as ordered by the Bankruptcy Court, Seller shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(c)        Seller shall, in good faith, using its commercially reasonable efforts and with the cooperative efforts of Purchaser, attempt to obtain in the Sale Order an exemption from Transfer Taxes pursuant to Section 1146(c) of the Bankruptcy Code.

(d)        If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

## ARTICLE 4
## INSTRUMENTS OF TRANSFER AND ASSUMPTION

Section 4.1.        Transfer Documents.  At the Closing, Seller will deliver to Purchaser (a) one or more Bills of Sale in substantially the form attached hereto as Exhibit B (the "Bill of Sale"), and (b) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, the Purchased Assets, and any other assignments as shall be reasonably necessary to vest in Purchaser all of Seller's right and title to, and interest in, the Purchased Assets.

Section 4.2.        Assignment and Assumption Documents.  At the Closing, Purchaser and Seller will execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit C (the "Assumption Agreement") in order to effect the assignment and assumption of the Assumed Liabilities.

## ARTICLE 5
## CONSIDERATION; ALLOCATION

Section 5.1.        Consideration.

(a)        In exchange for the sale, assignment, transfer, conveyance and delivery from Seller of the Purchased Assets, Purchaser shall:

    (i)  assume the Assumed Liabilities pursuant to this Agreement; and

    (ii)  pay the amount of Two Million Dollars ($2,000,000) by wire transfer to an account designated by the Seller, subject to any set-off or adjustment as set forth in the Transition Services Agreement.

Items (i) and (ii) of this Section 5.1(a) are referred to collectively as the "<u>Consideration</u>."

   Section 5.2.  <u>Allocation of Consideration</u>.  Within ninety (90) days following the Closing, Purchaser shall deliver to Seller Purchaser's proposed allocation (the "<u>Allocation Statement</u>") of the Consideration (including, without limitation, the Assumed Liabilities) among the Purchased Assets.  The Allocation Statement shall allocate the Consideration and any item required to be treated as an adjustment to the Consideration among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision.  If Seller agrees with the Allocation Statement and the allocation among the Purchased Assets set forth therein, Purchaser and Seller shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Consideration allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings).  Purchaser and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.  If, on the other hand, Seller objects to, or otherwise disagrees with the Allocation Statement, Purchaser and Seller shall use their commercially reasonable efforts to agree upon the allocation of the Consideration among the Purchased Assets.  In any event, Seller agrees to take no position in its tax returns, which are inconsistent with the Purchaser's allocations of the Consideration for tax purposes.  Purchaser shall be responsible for all fees associated with the preparation of tax returns.  Notwithstanding any other provisions of this Agreement, Purchaser's and Seller's obligations under this Section 5.2 shall survive Closing.

   Section 5.3.  <u>Recordation Fees; Permits</u>.  Purchaser shall pay the fees and costs of recording or filing all applicable conveyance instruments contemplated hereunder.  Purchaser shall pay all costs of applying for new Permits and obtaining the transfer of existing Permits which may be lawfully transferred.

**ARTICLE 6
CLOSING**

   Section 6.1.  <u>Closing Date</u>.  Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Buchalter Nemer PC, Suite 1500, 1000 Wilshire Boulevard, Los Angeles, California 90017, or such other location as may be mutually agreed upon between the Parties on the date  which is the third (3rd) business day following the date on which all conditions to Closing set forth in Articles 10 and 11 hereof have been satisfied or waived (the "**Closing Date**"), which is estimated to be September 30, 2015.  The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date.

# ARTICLE 7
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Purchaser that the statements contained in this Article 7 are, to Seller's Knowledge, true, correct and complete as of the date of this Agreement and will, to Seller's Knowledge, be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 7).

Section 7.1.    <u>Organization, Qualification and Corporate Power</u>.  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of California and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect.  Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted.  Seller has the power and authority to execute and deliver and, subject to entry of the Sale Order, perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby.  As used herein, the term "<u>Transaction Documents</u>" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by the parties or any one or more of them in accordance with the provisions of this Agreement.

Section 7.2.    <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>.  The execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the transfer or assignment of the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary corporate action.  Subject to obtaining the Sale Order and pursuant thereto, Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets owned by Seller.  The Sale Order to be entered by the Bankruptcy Court shall provide that this Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Seller, enforceable against such Seller in accordance with its terms.

Section 7.3.    <u>Title to and Condition of Assets</u>.  Except as set forth in <u>Schedule 7.3</u> hereto, Seller has good and marketable title to, or a valid leasehold interest in, all of the properties and assets included in the Purchased Assets, and upon the consummation of the transactions contemplated hereby and by the Transaction Documents, Purchaser will acquire good and marketable title to all of the Purchased Assets, free and clear of all Liens.  The Purchased Assets include, without limitation, all assets, tangible or intangible, of any nature whatsoever, necessary for the conduct of the Business and are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

Section 7.4.    <u>Liabilities</u>.  Other than the Excluded Liabilities, and except as set forth in <u>Schedule 7.4</u> hereto, Seller has no Liabilities relating to the Purchased Assets or the Business due or to become due except the Assumed Liabilities.

Section 7.5.    Corporate Records.  Seller has maintained its corporate records, which, in reasonable detail, accurately and fairly reflect the activities of Seller pertaining to the Business in all material respects.  Seller has not, in any manner that pertains to, or could affect, the Business or the Purchased Assets, engaged in any transaction, maintained any bank account or used any corporate funds except for transactions, bank accounts and funds which have been and are reflected in the normally maintained Corporate Records.

Section 7.6.    Legal Proceedings.  Except as set forth on Schedule 7.6 hereto, there is no Legal Proceeding (a) pending or, to the Knowledge of Seller, threatened or anticipated against or affecting Seller or the Purchased Assets (or to the Knowledge of Seller, pending or threatened, against any of the officers, directors or employees of Seller with respect to their business activities related to or affecting the Purchased Assets); (b) that challenges or that may have the effect of preventing, making illegal, delaying or otherwise interfering with any of the transactions contemplated by this Agreement; or (c) related to the Purchased Assets to which Seller is otherwise a party.  To the Knowledge of Seller, there is no reasonable basis for any such Legal Proceeding.

Section 7.7.    Real Property.  Except as set forth in Schedule 7.7 hereto, Seller does not own any real property.

Section 7.8.    No Violation of Laws or Agreements.  Subject to entry of the Sale Order by the Bankruptcy Court, the execution and delivery by Seller of this Agreement and the Transaction Documents contemplated hereby, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated herein and therein will not violate in any material respect, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Seller is subject; (ii) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Purchased Assets, any note, bond, mortgage, indenture, contract, agreement, lease, license, Permit, franchise or other instrument to which Seller is a party or by which any of the Purchased Assets are bound; and (iii) contravene, conflict with or result in a violation of any provision of any organizational documents of Seller.

Section 7.9.    Employee Benefits; ERISA Matters.

(a)    Schedule 7.9 hereto contains a complete list of all Employee Plans (i) covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business and/or (ii) with respect to which Purchaser may incur any Liability ("Business Employee Plans").  Seller has made available to Purchaser true and complete copies of all Employee Plans, including written interpretations thereof and written descriptions thereof which have been distributed to Seller's employees and for which Seller has copies, all annuity contracts or other funding instruments relating thereto, and a complete description of all Employee Plans which are not in writing.

(b)    Neither Seller nor any ERISA Affiliate sponsors, maintains, contributes to or has an obligation to contribute to, or has sponsored, maintained, contributed to or had an

12

**56**

obligation to contribute to, any Pension Plan subject to Title IV of ERISA, any Multiemployer Plan.

        (c)        Each Welfare Plan which covers or has covered employees or former employees of Seller or of its Affiliates in the Business and which is a "group health plan," as defined in Section 607(1) of ERISA, has been operated in compliance with provisions of Part 6 of Title I, Subtitle B of ERISA and Section 4980B of the Code at all times.

        (d)        There is no Legal Proceeding outstanding, relating to or seeking benefits under any Business Employee Plan that is pending, threatened or anticipated against Seller, any ERISA Affiliate or any Employee Plan.

        (e)        Neither Seller nor any ERISA Affiliate has any liability for unpaid contributions under Section 515 of ERISA with respect to any Welfare Plan (i) covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business and (ii) with respect to which Purchaser may incur any Liability.

        (f)        There are no Liens arising under the Code or ERISA with respect to the operation, termination, restoration or funding of any Business Employee Plan or arising in connection with any excise tax or penalty tax with respect to any Business Employee Plan.

        (g)        Each Business Employee Plan has at all times been maintained in all material respects, by its terms and in operation, in accordance with all applicable laws, including, without limitation, ERISA and the Code.

        (h)        Seller and its ERISA Affiliates have made full and timely payment of all amounts required to be contributed under the terms of each Business Employee Plan and applicable Law or required to be paid as expenses or as Taxes under applicable Laws, under such Employee Plan, and Seller and its ERISA Affiliates shall continue to do so through the Closing Date.

        (i)        Seller has no Business Employee Plan intended to qualify under Section 401 of the Code.

        (j)        Neither the execution and delivery of this Agreement or other related agreements by Seller nor the consummation of the transactions contemplated hereby or thereby will result in the acceleration or creation of any rights of any person to benefits under any Employee Plan (including, without limitation, the acceleration of the vesting or exercisability of any stock options, the acceleration of the vesting of any restricted stock, the acceleration of the accrual or vesting of any benefits under any Pension Plan or the acceleration or creation of any rights under any severance, parachute or change in control agreement).

        (k)        Neither Seller nor any ERISA Affiliate has incurred any liability with respect to any Employee Plan, which may create, or result in any liability to Purchaser.

        (l)        No amounts payable under the Business Employee Plans will fail to be deductible for federal income tax purposes by virtue of Section 280G of the Code.

Section 7.10.    <u>Labor Matters</u>.

(a)    Except as set forth on <u>Schedule 7.10</u> hereto, there are no employment, consulting, severance or indemnification contracts between the Seller and any of its employees.

(b)    Except as set forth on <u>Schedule 7.10</u> hereto, (i) Seller is not party to or bound by any collective bargaining or similar agreement with any labor organization; (ii) no employees of Seller are represented by any labor organization; (iii) Seller has no Knowledge of any union organizing activities among the employees of the Seller; and (iv) during the past year, there has been no actual or, to the Knowledge of Seller, threatened strikes, slowdowns, work stoppages or lockouts affecting the Seller.

(c)    Except as set forth on <u>Schedule 7.10</u> hereto, Seller is and has been in compliance with all notice and other requirements under the WARN Act.

(d)    Except as set forth on <u>Schedule 7.10</u> hereto, to Seller's Knowledge (i) there are no material claims (i.e., claims not covered by insurance) by any or on behalf of any of the employees of the Business pending with respect to their employment or benefits incident thereto with respect to sexual harassment and discrimination claims and claims arising under workers' compensation laws which are not ordinary course of business claims for a business such as the Business (collectively, "<u>Employee Claims</u>"), and (ii) there have been no organizational efforts known to Seller during the past five years involving any of such employees to organize into a collective bargaining unit.

Section 7.11.    <u>Reserved</u>.

Section 7.12.    <u>Reserved</u>.

Section 7.13.    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 7.13</u> hereto, (A) Seller is in compliance with all applicable Environmental Laws, except where failure to be in compliance would not have a Material Adverse Effect; (B) there is no Environmental Claim pending against Seller; (C) Seller has obtained all material permits, approvals, identification numbers, licenses or other authorizations required under any applicable Environmental Laws, if any, and is and has been in compliance with their requirements;  (D) to the Knowledge of the Seller there are no underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed of on any real property currently leased by Seller other than in compliance with Environmental Laws; (E) Seller has not undertaken or completed any investigation or assessment or remedial or response action relating to any such release, discharge or disposal of or contamination with Hazardous Materials at any site, location or operation of the Business, either voluntarily or pursuant to the order of any Governmental Entity or the requirements of any Environmental Law; and (F) except as set forth on <u>Schedule 7.13</u>, there have been no Environmental Claims against the Seller.

Section 7.14.    <u>Brokers</u>. Except as set forth on <u>Schedule 7.14</u> hereto, the liability to whom Seller shall be solely responsible, Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Seller which is or may be entitled to a

14

**58**

commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 7.15.    Permits.  The Permits constitute all of the Permits necessary for Seller to lawfully conduct and operate the Business, as applicable, as they are presently conducted and to permit Seller to own and use the Purchased Assets to own and use its assets, in each case, in the manner in which they are presently owned and used.  Except as set forth on Schedule 7.15 hereto, Seller is and at all times has been in compliance in all material respects with all Permits applicable to it or to the conduct and operations of the Business or relating to or affecting the Purchased Assets.  Seller has not received any notice to the effect that, or otherwise been advised of (i) any actual, alleged, possible or potential violation of, or failure to comply with, any such Permits or (ii) any actual, alleged, possible or potential revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Permit.  No event has occurred, and to Seller's Knowledge no circumstance exists, that (with or without notice or lapse of time) (i) may constitute or result directly or indirectly in a violation by Seller of, or a failure on the part of Seller to comply with, any such Permits or (ii) result directly or indirectly in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Permit.  All applications for or renewals of all Permits have been timely filed and made and no Permit will expire or be terminated as a result of the consummation of the transactions contemplated by this Agreement.  No present or former shareholder, director, officer or employee of Seller or any Affiliate thereof, or any other Person, owns or has any proprietary, financial or other interest (direct or indirect) in any Permit that Seller owns, possesses or uses.

Section 7.16.    Insurance.  Except as set forth on Schedule 7.16 hereto, all of the Insurance Policies are in full force an effect.  Seller is not in default under any of such policies or binders, and Seller has not failed to give any notice or to present any claim under any such policy or binder in a due and timely fashion.

Section 7.17.    Taxes; Tax Returns.  Except as set forth on Schedule 7.17 hereto, and Tax Returns for Transfer Taxes in connection with the transactions contemplated by this Agreement, which will be filed promptly after the Closing Date, Seller has (A) filed with the appropriate taxing authorities all Tax Returns relating to the Business required to be filed for any period ending on or before the Closing Date (or are properly on extension), and all such filed Tax Returns are true, correct and complete in all material respects, and (B) except as set forth on Schedule 7.17, paid in full all Taxes shown to be due on such Tax Returns, together with any penalties or fines due in connection therewith.  Except as set forth on Schedule 7.17 hereto, there are no Liens for Taxes upon the Business or the Purchased Assets.  Seller will file appropriate Tax Returns for any period ending on or before the Closing Date, and pay any Taxes for such periods when due.  Except as set forth on Schedule 7.17 hereto, Seller has not received any outstanding notice of audit, and is not undergoing any audit, of Tax Returns relating to the Business and has never received any notice of deficiency or assessment from any taxing authority with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled.  There have been no waivers of statutes of limitations by Seller with respect to any Tax Returns relating to the Business.  Except as set forth on Schedule 7.17 hereto, Seller has complied in all material respects with all applicable laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by law to be withheld from the wages or salaries of employees and independent contractors of the Business, and is not

15

liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such laws, rules and regulations.

Section 7.18.    Financial Statements.

(a)    Attached hereto as Annex I are the unaudited and unreviewed income statements for the East Coast Data Centers for the twelve month periods ending as of December 31, 2013 and December 31, 2014 (collectively, the "Year End Financial Statements") and for the six month period ending as of June 30, 2015  (the "Interim Financial Statements" and, together with the Year End Financial Statements, the "Financial Statements").  The Financial Statements have been prepared from the Corporate Records and fairly and accurately present the financial condition and the results of operations, income, expenses, assets, Liabilities (including all reserves), and changes in shareholders' equity and of Seller as of the respective dates of, and for the periods referred to in, such Financial Statements.

(b)    Except as set forth on Schedule 7.18 hereto, the Financial Statements have been prepared and Seller maintains a standard system of accounting established and administered in accordance with GAAP and.

Section 7.19.    Related Party Transactions.  Except as set forth on Schedule 7.19 hereto, none of Seller, any Affiliate thereof, Seller's shareholders or any Affiliate or Family Member thereof is presently or has, since the most recent Year End Financial Statements, and Interim Financial Statements, borrowed any moneys from or has any outstanding debt or other obligations to Seller or is presently a party to any transaction with Seller relating to the Business. Except as set forth on Schedule 7.19 hereto, none of Seller, any Affiliate thereof, or any director, officer or key employee of any such Persons (a) owns any direct or indirect interest of any kind in (except for ownership of less than 1% of any public company, provided, that such owner's role is that solely of a passive investor), or controls or is a director, officer, employee or partner of, consultant to, lender to or borrower from, or has the right to participate in the profits of, any Person which is (i) a competitor, supplier, customer, landlord, tenant, creditor or debtor of Seller, (ii) engaged in a business related to the Business or (iii) a participant in any transaction to which Seller is a party or (b) is a party to any Contract with Seller.  Except as set forth on Schedule 7.19 hereto, Seller has no Contract or understanding with any officer, director or key employee of Seller or any of Seller's shareholders or any Affiliate or Family Member thereof with respect to the subject matter of this Agreement, the consideration payable hereunder or any other matter.

Section 7.20.    Compliance with Law.

(a)    Except as set forth on Schedule 7.20 hereto, Seller and the conduct of the Business are and at all times have been in compliance in all material respects with all Laws applicable to them or to the conduct and operations of the Business or relating to or affecting the Purchased Assets.  Seller has not received any notice to the effect that, or otherwise been advised of (i) any actual, alleged, possible or potential violation of, or failure to comply with, any such Laws, or (ii) any actual, alleged, possible or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.  To the Knowledge of Seller, no event has occurred or circumstance exists that (with or without notice or lapse of time) (i) may constitute or result in a violation by Seller of, or a failure on the part of

16

**60**

Seller, any such Laws or (ii) may give rise to any obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)    Except as set forth on Schedule 7.20 hereto, none of Seller, or any of its directors, officers, or to the Knowledge of Seller, any employee or other Person affiliated with or acting for or on behalf of Seller, has, directly or indirectly, (i) made any contribution, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of form, whether in money, property or services (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, (C) to obtain special concessions or for special concessions already obtained, for or in respect of Seller or any of its Affiliates or (D) in violation of any Laws of the United States (including, without limitation, the Foreign Corrupt Practices Act of 1977, as amended (15 U.S.C. Sections 78dd-1 et seq.)) or any laws of any other country having jurisdiction; or (ii) established or maintained any fund or asset that has not been recorded in the Corporate Records of Seller.

Section 7.21.    No Other Agreements.  Neither Seller, nor any of its shareholders, officers, directors or Affiliates has any legal obligation, absolute or contingent, to any other Person to sell, assign or transfer any part of the Purchased Assets, to sell any stock of or other equity interest (other than warrants or options in favor of Seller's officers, directors or employees) in Seller or to effect any merger, consolidation or other reorganization of Seller or to enter into any agreement with respect thereto.

Section 7.22.    Material Misstatements Or Omissions.  No representation or warranty made by Seller in this Agreement or the Disclosure Schedules hereto omits or will omit to state any material fact necessary to make the statements or facts contained therein not misleading.

## ARTICLE 8
## PURCHASER'S REPRESENTATIONS

Purchaser represents and warrants (and as to Section 8.5, acknowledges) to Seller that the statements contained in this Article 8 are true, correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 8).

Section 8.1.    Organization; Qualification and Corporate Power.  Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Purchaser has all necessary power and authority to (a) own and operate its properties, (b) carry on its business as it is now being conducted, (c) perform its obligations under this Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby, and (d) own and operate the Purchased Assets and Business.

Section 8.2.    Authorization, Execution and Delivery of Agreement and Transaction Documents.  All necessary consents and approvals have been obtained by Purchaser for the execution and delivery of this Agreement and the Transaction Documents.  The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all

17

necessary corporate action. Purchaser has full power, right and authority to acquire the Purchased Assets. This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors.

Section 8.3.    Brokers.  Purchaser has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 8.4.    Funding.  Purchaser has available to it all of the required cash or financing to pay the cash Consideration at Closing and to otherwise perform all of Purchaser's obligations pursuant to this Agreement.  Purchaser's financial ability to consummate the transaction under this Agreement is therefore not subject to any financing contingency.

## ARTICLE 9
## SELLER'S AND PURCHASER'S COVENANTS AND AGREEMENTS

Section 9.1.    Conduct of Business.  Subject to any restrictions and obligations imposed by the Bankruptcy Court, Seller will not, without Purchaser's consent, engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business, including, without limitation, any amendment or change to its employee retention program, or any employment agreements between Seller and its employees.  Without limiting the generality of the foregoing (but subject to the express limitation set forth in the immediately preceding sentence), Seller will, other than in the Ordinary Course of Business and with Purchaser's consent, refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any material Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not one of the East Coast Data Centers or otherwise part of the Purchased Assets, (iii) except as otherwise provided or required in this Agreement, terminating, amending or modifying the material terms of any of the Assumed Contracts or Personal Property Leases; or (iv) making any change in the compensation payable or to become payable to the employees of the Business; provided, however, notwithstanding anything to the contrary in the preceding sentence, Seller may, in its reasonable discretion and upon prior written notice to Purchaser take such actions in connection with or as a result of the consequences (adverse or otherwise) of filing the Bankruptcy Case, if any, to cure defaults in respect of the Assumed Contracts or Personal Property Leases.

Section 9.2.    Mutual Covenants.  The parties hereto mutually covenant (and subject to the other terms of this Agreement):

(a)    from the date of this Agreement to the Closing Date, to cooperate with each other in determining whether filings are required to be made or consents required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such filings promptly and in seeking to obtain timely any such consents (each party hereto shall furnish to the other and to the other's counsel all such information as may be reasonably required in order to

18

effectuate the foregoing action), which consents shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code;

(b)    after the Closing Date, each of the parties hereto will give, or cause to be given, to the other and/or the other's representatives, during normal business hours: (i) reasonable access, to the extent permitted by applicable law, to its personnel, properties, titles, contracts, books, records, files and documents (collectively, the "Documentation"); provided, however, Seller shall only be entitled to such reasonable access from Purchaser as reasonable required in connection with the transactions contemplated hereby or as is otherwise necessary or appropriate in connection with Seller's ongoing administration and/or closing of the Bankruptcy Case; and (ii) at the requesting party's expense, copies of such Documentation, as necessary to allow the requesting party to obtain information in connection with any claims, demands, other audits, suits, actions or proceedings by or against such requesting party as the owner and operator of the Purchased Assets and the Business or otherwise in furtherance of the purposes described in clause (i) above, including, without limitation, in connection with Seller's bankruptcy proceedings. In connection with access to the records of a party's accountants, the requesting party shall execute and deliver such "hold harmless" agreements as the other party's accountants may reasonably request; and

(c)    from the date of this Agreement to the Closing Date, to advise the other parties promptly if such party determines that any condition precedent to its obligations hereunder will not be satisfied in a timely manner.

Section 9.3.    Filings and Authorizations.  The parties hereto shall, as promptly as practicable, cause to be made all such filings and submissions as may be required to consummate the terms of this Agreement.  Seller and Purchaser shall keep each other apprised of the status of any communications with, and inquiries or requests for additional information from, any Governmental Authority, and shall comply promptly with any such inquiry or request.  Seller shall not make any filings or submissions without the prior approval of Purchaser, which approval shall not be unreasonably withheld.

Section 9.4.    Access to Information.

(a)    Prior to and through the date on which the Closing occurs or this Agreement is terminated, Seller shall cooperate with Purchaser and shall give Purchaser and its representatives (including Purchaser's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Purchaser all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement as Purchaser may reasonably request.

19

**63**

(b)     Seller agrees to use commercially reasonable efforts to obtain consent from any third party with respect to a restriction against allowing Purchaser to receive and review any contract, agreement or lease of Seller.

Section 9.5.    Public Announcement.  Subject to the provisions of the Bankruptcy Code and Seller's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, no party hereto shall make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party hereto (which will not be unreasonably withheld or delayed), unless counsel to such party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States) (in which case the parties hereto shall make reasonable efforts to consult with each other prior to such required announcement).

Section 9.6.    Taxes.

(a)     Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be a Non-Assumed Liability. Subject to the terms of Section 5.4, Purchaser shall be responsible for all Taxes in connection with, relating to or arising out of the Purchased Assets attributable to taxable periods, or portions thereof, from and after the Closing.  All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller, including any and all sales taxes incurred or owed as a result of the transactions contemplated by this Agreement.

(b)     If Seller is unable to obtain an exemption, pursuant to Section 1146(c) of the Bankruptcy Code in the Sale Order, from all for all sales and transfer Taxes, if and as applicable to the transactions contemplated hereby or imposed by reason of the transfers of the Purchased Assets provided under this Agreement (collectively, the "Transfer Taxes"), such Transfer Taxes shall be borne by the Purchaser.

(c)     Seller and Purchaser shall (i) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (ii) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (iii) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 9.7.    Consents.  Each party hereto will use its reasonable commercial efforts and will cooperate with the other party hereto to obtain all consents required from third persons, whose consent or approval is required pursuant to any Assumed Contract, Personal Property Leases, Permit, or otherwise, in order to consummate the transaction contemplated hereby; provided it shall be the responsibility of Seller to obtain any necessary such consents; and further provided that Purchaser and Seller agree that Seller shall not be required to obtain any consent

the need for which is obviated by the entry of the Sale Order or otherwise by any provision of the Bankruptcy Code.  In connection with the foregoing the Purchaser and the Seller agree that the only consents and waivers necessary for the consummation of the Transactions are those consents and waivers listed in <u>Schedule 9.7</u> hereto (the "<u>Required Consents</u>").

Section 9.8.        <u>Good Faith Efforts</u>.  Without limiting the specific obligations of any party hereto under any covenant or agreement hereunder, each party hereto shall use its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement on or before the Outside Date.

Section 9.9.        <u>Employees</u>.

(a)        Subject to and in accordance with the provisions of this Section 9.9, Purchaser shall, effective upon the Closing, offer employment to the employees who are employed by Seller as of the Closing in respect of the East Coast Data Centers and are listed on <u>Schedule 9.9</u> hereto (such employees other than the Key Employees, the "<u>Employees</u>"). Purchaser shall hire all of the Employees who accept such offer.  Employees who accept such offers and become either full-time or part-time employees of Purchaser, consistent with their employment status with Seller, upon the Closing are hereinafter referred to as "<u>Transferred Employees</u>."  Seller shall use reasonable efforts to assist Purchaser in securing the employment of the Employees.

(b)        The employment of each Transferred Employee by Seller shall end effective as of the close of business on the day before the Closing and the employment of the Transferred Employees by Purchaser shall commence at or after 12:01 a.m. on the day of the Closing.

Section 9.10.        <u>Further Assurances</u>.  From time to time after the Closing and without further consideration, Purchaser and Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be conferred and conveyed by this Agreement; provided that, notwithstanding anything to the contrary in this Section 9.10 or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (i) increase the liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (ii) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (iii) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.  The parties undertake, for a period of two (2) years (or the applicable statute of limitations) after the Closing Date (or, as to Seller, until the Bankruptcy Case is closed if that occurs sooner), to retain at their own expense all records and documents relating to the Purchased Assets and to make such records and documents available for inspection and copying at reasonable times and upon reasonable notice, at the expense of the requesting party; provided, however, no party shall be required to make available records and documents which it is prohibited to make available by law.

21

**65**

Section 9.11.    <u>Confidentiality</u>.

(a)    Each party acknowledges that it currently has and will directly or indirectly disclose Confidential Information to the other party in the course of negotiation of and performance of this Agreement and the Transition Services Agreement.  All such Confidential Information disclosed hereunder shall remain the sole property of the disclosing party (or other third party), and the receiving party shall have no interest in, or rights with respect thereto, except as set forth herein.  For avoidance of doubt, any Confidential Information of Seller relating to the Purchased Assets and the Assumed Contracts shall be deemed to be Confidential Information of the Purchaser as of the Closing ("<u>Deemed Purchaser Confidential Information</u>"), notwithstanding the fact that Seller or any of its members, managers, employees or representatives including Founder have knowledge of such Deemed Purchaser Confidential Information obtained prior to the negotiation and performance of this Agreement. Each party agrees to treat such Confidential Information with the same degree of care and security as it treats its Confidential Information and in any event no less degree of care and security than a reasonably prudent business person would utilize to protect from disclosure and keep confidential its Confidential Information.  Each party may disclose such Confidential Information only to those employees and agents who require such knowledge to perform services under this Agreement and each party shall be liable for the acts of such employees and agents in breach of this Section 9.11.  Except as otherwise contemplated by this Agreement, neither party shall disclose the Confidential Information of the other party to any third party without the prior written consent of the disclosing party, and the duty of confidentiality created by this section shall survive any termination of the Agreement for a period of five (5) years. Notwithstanding the foregoing, (i) Seller shall retain the right to use such Deemed Purchaser Confidential Information solely to the extent necessary for the continued operation of Seller's Business and (ii) Seller may disclose any Deemed Purchaser Confidential Information which does not relate exclusively or specifically to the Purchased Assets to third parties so long as such third party is bound by an obligation of confidentiality and non-disclosure and such disclosure to a third party is necessary in connection with the continued operation of Seller's Business.

(b)    As used herein, "<u>Confidential Information</u>" means all information or data relating to a party and its affiliates, operations, employees, products or services, clients, customers or potential customers. Confidential Information shall include vendor and customer information, pricing information, and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information is: (i) not Deemed Purchaser Confidential Information and is already lawfully known to the receiving party as of the Closing Date as evidenced by reasonable documentary proof, free of any restriction at the time it is obtained; (ii) subsequent to the Closing Date is learned of by the receiving party from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of or breach of this Agreement by the receiving party; (iv) independently developed by the receiving party without reference or access to any Confidential Information of the disclosing party; or (v) required to be disclosed by law.

Section 9.12.    <u>Reserved</u>.

**66**

Section 9.13.    <u>Survival of Representations and Warranties</u>.    None of the representations and warranties of Seller or Purchaser contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder.

Section 9.14.    <u>"AS IS" Transaction; Disclaimer of Implied Warranties</u>.    Except as expressly provided in Article 7 above, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising a part of the Purchased Assets or which is the subject of any Assumed Contract or Personal Property Leases, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any such real property or improvements, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities, Assumed Contracts or Personal Property Leases, the title of the Purchased Assets (or any portion thereof), the merchantability or fitness of the personal property comprising a portion of the Purchased Assets or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets (or any portion thereof).    Without in any way limiting the foregoing, except as otherwise expressly provided in Article 7 above, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate and, that in proceeding with the consummation of its acquisition of the Purchased Assets, except for the representations and warranties set forth in Article 7 above, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, and in light of the fact that the representations and warranties set forth in Article 7 will lapse and terminate and be of no further force or effect following the Closing, Purchaser will accept the Purchased Assets at the Closing **"AS IS," "WHERE IS," and "WITH ALL FAULTS."**

## ARTICLE 10
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

Section 10.1.    <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>.  Each of the representations and warranties made by Seller shall be true and correct in all material respects on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by terms such as "material" and "Material Adverse Effect," in which case such representations and warranties shall be true and correct in all respects at and as of the Closing Date.  Seller shall have complied with and performed in all material

respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 10.2.    Authorizing Resolutions.  Seller shall have delivered to Purchaser copies of the authorizing resolutions of the Board of Directors of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 10.3.    Officer's Certificate.  Seller shall have delivered to Purchaser a certificate executed by an executive officer of Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in this Article 10.

Section 10.4.    Bill of Sale; Assumption Agreement.  Seller shall have delivered to Purchaser an executed Bill of Sale and Assumption Agreement pursuant to Sections 4.1 and 4.2 hereof.

Section 10.5.    Transition Services Agreement.  Seller shall have executed and delivered the Transition Services Agreement substantially in the form attached hereto as Exhibit D (the "Transition Services Agreement")

Section 10.6.    Bankruptcy Matters.  The Sale Procedures Order shall be entered by a date that affords sufficient time to allow for the Auction to be held on the date set forth in Section 3.1(b) below, and the Sale Order shall have been entered by the Bankruptcy Court by no later than the Outside Date.  All such orders must be in effect, and must not have been reversed or stayed or modified in any material respect.

Section 10.7.    Required Consents.  Purchaser shall have received all Required Consents.

Section 10.8.    No Material Adverse Change or Destruction of Property.  Between the date hereof and the Closing and except as otherwise provided in this Agreement, there shall have been no Material Adverse Change to the Purchased Assets or the Assumed Liabilities.

## ARTICLE 11
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

Section 11.1.    Accuracy of Representations and Warranties; Performance of this Agreement.  Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date.

Section 11.2.     <u>Authorizing Resolutions</u>.  Purchaser shall have delivered to Seller copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 11.3.     <u>Assumption Agreement</u>.  Purchaser shall have delivered to Seller an executed Assumption Agreement pursuant to Section 4.2 hereof.

Section 11.4.     <u>Transition Services Agreement</u>.  Purchaser shall have executed and delivered the Transition Services Agreement.

Section 11.5.     <u>Bankruptcy Matters</u>.  The Sale Order shall have been entered by the Bankruptcy Court by no later than the Outside Date.  The Sale Order must be in effect, and must not have been reversed or stayed or modified in any material respect.

# ARTICLE 12
# INTENTIONALLY OMITTED

# ARTICLE 13
# TERMINATION

Section 13.1.     <u>Breaches and Defaults; Opportunity to Cure</u>.  Prior to the exercise by a party of any termination rights afforded under this Agreement, if either party (the "<u>Non-Breaching Party</u>") believes the other (the "<u>Breaching Party</u>") to be in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have ten (10) calendar days from the receipt of such notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party; <u>provided</u>, <u>however</u>, that the cure period for a breach shall in no event extend beyond the Outside Date.  If the breach is not cured within such time period, then the Non-Breaching Party shall be entitled to terminate this Agreement if the breach is such that the condition set forth in Section 10.1 or 11.1, as applicable, shall not be satisfied (as provided in Section 13.2).  This right of termination shall be in addition to, and not in lieu of, any rights of the Non-Breaching Party under applicable Laws.  Upon any termination pursuant to Section 13.2 (other than Section 13.2(d)), Seller shall cause the Deposit to be promptly returned to Purchaser.

Section 13.2.     <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other party hereto, at any time prior to the Closing:

(a)     by mutual written consent of Seller and Purchaser;

(b)     by Seller or Purchaser if (i) the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to a third-party purchaser following the hearing on the Sale Order, or (ii) the Sale Procedures Order and the Sale Order are for any reason (other than a breach or default hereunder by the party seeking to terminate) not entered on or before the Outside Date;

25

(c)    subject to the right to cure set forth in Section 13.1 at any time prior to the Closing Date, by Purchaser if Seller alters, amends or breaches any of the covenants in Section 9.1, is in breach of any material covenant, representation, undertaking or warranty, or if it appears that a condition set forth in Article 10 is impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement) to satisfy and Purchaser has not waived such condition in writing on or before the Closing Date;

(d)    subject to the right to cure set forth in Section 13.1, at any time prior to the Closing Date by Seller if Purchaser is in breach of any material covenant, representation or warranty or if it appears that a condition set forth in Article 11 is impossible (other than through the failure of Seller to comply with their obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date;

(e)    at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, by either Seller or Purchaser, if an Alternative Bid is accepted and approved by the Bankruptcy Court, and (ii) Purchaser's right to terminate this Agreement pursuant to this Section 13.2(e) is subject to the "back-up bid" provisions of Section 3.1(d) above;

(f)    by Purchaser if Seller refuses to close for any reason whatsoever, other than a breach or default by Purchaser of Purchaser's obligations under this Agreement; or

(g)    by Seller or Purchaser if the Closing shall not have occurred on or before the Outside Date, unless the failure to have the Closing shall be due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing.

Upon entry of the Sale Order, the mutual termination right set forth in Section 13.2(b) above shall cease.

## ARTICLE 14
## BROKERS' FEES

Each party represents and warrants to the other that it shall be solely responsible for the payment of any fee or commission due to any broker or finder it has engaged with respect to this transaction, if any, and the other party hereto shall be indemnified for any liability with respect thereto.

## ARTICLE 15
## MISCELLANEOUS

Section 15.1.    Additional Instruments of Transfer.  From time to time after the Closing, each party shall, if requested by another party, make, execute and deliver such additional assignments, bills of sale, deeds and other instruments and documents, as may be reasonably necessary or proper to carry out the specific provisions of this Agreement, including, without limitation, transfer to Purchaser of all of Seller's right, title and interest in and to the Purchased Assets and any right, title or interest that Seller may have in any asset used or held for use  in Business, other than an Excluded Asset.

26

**70**

Section 15.2.    Notices.  All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by telecopier, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

> If to Purchaser:
>
> Netunim, Inc.
> 5425 Wisconsin Avenue, Suite 701
> Chevy Chase, MD 20815
> Attention:  Lawrence Berger
> Facsimile:  240-223-1331
> Email: lberger@bchhold.com
>
> with a required copy to:
>
> Alan Noskow
> Manatt, Phelps & Phillips, LLP
> 1050 Connecticut Avenue, Suite 600
> Washington, DC 20036
> Facsimile: (202) 637-1595
> Email: anoskow@manatt.com
>
> If to Seller:
>
> Pervez Delawalla
> President and CEO
> Net Data Centers, Inc.
> 898 N. Sepulveda Blvd., Suite 500
> El Segundo, CA 900__
> Facsimile:  310-
> Email:
>
> with required copies to:
>
> Paul A. Beck
> Lewis R. Landau
> Law Offices of Paul A. Beck, APC
> 13701 Riverside Drive, Suite 701
> Sherman Oaks, CA. 91423
> Facsimile:  (818) 501-1241
> Email:  pab@pablaw.org and lew@landaunet.com

Notices delivered personally shall be effective upon delivery against receipt.  Notices transmitted by telecopy shall be effective when received, provided that the burden of proving notice when notice is transmitted by telecopy shall be the responsibility of the party providing such notice.  Notices delivered by overnight mail shall be effective when received.  Notices

27

delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or 72 hours after mailing, whichever is earlier.

Section 15.3.    <u>Expenses</u>.  Except as provided in the second sentence of this Section 15.3, and, to the extent that Purchaser is otherwise entitled thereto in accordance with the provisions of this Agreement, each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby. In the event either party shall bring any action or proceeding in connection with the performance, breach or interpretation of this Agreement or any Transaction Document, the prevailing party in such action or proceeding shall be entitled to recover from the losing party all court costs reasonable costs and expenses of such action, including, without limitation, attorneys' fees.

Section 15.4.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of California (without application of principles of conflicts of law).  In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of California. Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

Section 15.5.    <u>Assignment</u>.  This Agreement binds and benefits the parties and their respective successors and assignees.  Purchaser shall have the right to freely assign any of its rights under this Agreement, provided, however, Seller will not assign any of its rights under this Agreement prior to the Closing without the prior written discretionary consent of Purchaser.  No party may delegate any performance of its obligations under this Agreement, except that Purchaser may at any time delegate the performance of its obligations to any Affiliate of Purchaser so long as Purchaser remains fully responsible for the performance of the delegated obligation.

Section 15.6.    <u>Successors and Assigns</u>.  All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

Section 15.7.    <u>Amendments; Waivers</u>.  No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege.  No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default.  No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 15.8.    <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Disclosure Schedules which are hereby incorporated by reference into and made a part of this

Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto, either verbal or written, and constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement.

Section 15.9.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement.  Facsimile and/or PDF signatures shall be deemed original signatures.

Section 15.10.    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

Section 15.11.    Section Headings.  The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 15.12.    Interpretation.  As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

Section 15.13.    Reasonable Access to Records and Certain Personnel. For a period of six (6) months following the Closing (or until the closing of the Bankruptcy Case, if the Bankruptcy Case is closed sooner): (i) Purchaser shall permit Seller's counsel and other professionals and counsel for any successor to Seller and its respective professionals (collectively, "Permitted Access Parties") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include (xx) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request, and (yy) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses Purchaser for the reasonable costs and expenses thereof, and (ii) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not materially interfere with Purchaser's business operations and does not require access to Purchaser documents which are covered by a duty of confidentiality or impact protection of such documents under attorney-client privilege.

Section 15.14.    Third Parties.  Nothing herein, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 15.15.    Definitions.  For purposes of this Agreement (including the Disclosure Schedules hereto) the terms defined in this Agreement shall have the respective meanings specified herein, and, in addition, the following terms shall have the following meanings:

"Affiliate" means, as to any Person, any other Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of (i) 20% or more of the then outstanding voting securities of such Person, or (ii) the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other direct or indirect ownership interest, by Contract or otherwise.

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"Bankruptcy Case" shall mean the case commenced by Seller under chapter 11 of the Bankruptcy Code.

"Benefit Arrangement" means any employment, consulting, severance or other similar contract, plan, arrangement or policy, and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred compensation, profit-sharing bonuses, stock options, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which (A) is not a Welfare Plan, Pension Plan or Multi-employer Plan, and (B) is entered into, maintained, contributed to or required to be contributed to, by Seller or an ERISA Affiliate or under which Seller or any ERISA Affiliate may incur any liability.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"Customer" shall refer to any former, existing or prospective customer of Services as of the date hereof and the Closing Date.

"Cure Costs" shall have the meaning ascribed to such term under the Bankruptcy Code.

 "Disclosure Schedule" means the schedule executed and delivered by Seller to Purchaser as of the Execution Date setting forth the exceptions to the representations and warranties contained in Article 7 and certain other information called for by this Agreement, in each case as amended pursuant to the terms hereof.  Unless otherwise specified, each reference in this

30

Agreement to any numbered schedule is a reference to the corresponding numbered schedule that is included in the Disclosure Schedule.

"<u>Employee Plans</u>" means all Benefit Arrangements, Pension Plans and Welfare Plans.

"<u>Environmental Claim</u>" shall mean any claim, action, demand, order, or notice by or on behalf of, any Governmental Authority or person alleging potential liability arising out of, based on or resulting from the violation of any Environmental Law or permit or relating to any Hazardous Materials.

"<u>Environmental Laws</u>" shall mean all Laws that are applicable to the Business o relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to (A) the Releases or threatened releases of Hazardous Materials or materials containing Hazardous Materials or (B) the manufacture, generation, handling, treatment, storage, transport, disposal or handling of Hazardous Materials or materials containing Hazardous Materials.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"<u>Family Member</u>" means, with respect to any individual (i) the individual, (ii) the individual's spouse, (iii) any other natural Person who is related to the individual or the individual's spouse within the second degree (including adopted children) and (iv) any other natural Person who resides with such individual.

"<u>Financial Statements</u>" means the Year-End Financial Statements and the Interim Financial Statements.

"<u>Founder</u>" means Pervez Delawalla.

"<u>GAAP</u>" means generally accepted accounting principles as used in the United States, as in effect from time to time.

"<u>Governmental Authority</u>" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"<u>Hazardous Materials</u>" means all substances, matters and other particles defined or listed as "hazardous" or "toxic" under Environmental Laws or are otherwise subject to or regulated by Environmental Laws.

"<u>Knowledge</u>" means in the case of Seller, the actual, current knowledge (after reasonable inquiry) of the Founder Cheyenne Tanner and Corrie Arana.

"<u>Laws</u>" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law.

31

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures, or other interest in real property which is used in Seller's business in respect of the East Coast Data Centers.

"Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, whether or not secured.

"Liens" means any security interests, mortgages, interests, liens, pledges, charges, defects of title, options and other rights of third parties, rights of first refusal, claims (as defined in Section 101 of the Bankruptcy Code), or any other encumbrance or restriction on ownership provided such encumbrance or restriction on ownership can be overridden by Section 363 of the Bankruptcy Code.  "Liens" shall not include liens for current taxes not yet due and payable.

"Material Adverse Effect" or "Material Adverse Change" means a change in or effect on the Purchased Assets or the Assumed Liabilities that is or could reasonably be expected to materially and adversely affect the Purchaser's ability to utilize the Purchased Assets taken as a whole.  For avoidance of doubt, if any one or more of the top twenty largest customers of Seller at the East Coast Data Centers terminates its relationship with Seller or notifies Seller (or Seller otherwise has Knowledge) that such customer does not intend to continue as a customer or intends to reduce the level at which it obtains services from Seller (or Purchaser if such notice relates to a post-Closing period) it shall constitute a Material Adverse Change hereunder; provided, that, notwithstanding the foregoing, it shall not constitute a Material Adverse Change if Seller, after receiving any such notice or obtaining any such Knowledge with respect to a customer, provides prompt notification to Purchaser thereof and is thereafter able to retain such customer on terms no less favorable than those currently in place with the Seller or as otherwise acceptable to Purchaser in its sole discretion.  Material Adverse Change does not include any change or effect caused by war, acts of nature, general strike, acts of terror, general economic changes or conditions or changes in Laws; unless such Laws or conditions apply solely or principally to the Business or the Company.

"Multiemployer Plan" means any "multiemployer plan" as defined in Section 3(37) of ERISA.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Pension Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or has maintained, administered,

contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate may incur any liability.

"Person" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"Release" shall mean any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment, including the movement of Hazardous Materials through the air, soil, surface water or groundwater.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of the Transaction Documents, and (b) authorization for (i) the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests.

"Sale Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the bidding procedures as contemplated pursuant to Article 3 hereof.

"Sale Procedures Order" means the order entered by the Bankruptcy Court with respect to the Overbid Procedures Motion and more fully described in Section 3.3 hereof.

"Services" means the collocation and other services offered by the Seller in respect of the East Coast Data Centers as of the date hereof and the Closing Date, which includes data center space, data center power and cooling, network connectivity, and on-site support.

"Taxes" means taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, territorial, local or foreign taxing authority, including income, gross receipts, excise, property, sales, transfer, franchise, payroll, withholding, social security and other taxes, and shall include any interest, penalties or additions attributable thereto.

"Tax Return" means any return, report, information return or other document (including any related or supporting information).

"Welfare Plan" means any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or under which Seller or any ERISA Affiliate may incur any Liability.

**[Remainder of Page Intentionally Left Blank]**

33

34

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

**SELLER:**

NET DATA CENTERS, INC., Debtor and Debtor in Possession

By:_____

Name: _____

Title: _____

**PURCHASER**:

NETUNIM, INC.

By:_____

Name: _____

Title: _____

35

**Exhibit A**

Sale Procedures Order

**Exhibit B**

<u>Bill of Sale</u>

**Exhibit C**

Assumption Agreement

**Exhibit D**

<u>Transition Services Agreement</u>

**Annex I**

<u>Year End Financial Statements</u>

**Annex II**

<u>Interim Financial Statements</u>

1

**85**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

13701 Riverside Drive, Suite 701
Sherman Oaks, California 91423

A true and correct copy of the foregoing document entitled (*specify*): _____
DEBTOR'S NOTICE OF AND MOTION TO ESTABLISH PROCEDURES FOR THE SALE OF ESTATE'S EAST
COAST ASSETS_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
  08/25/2015_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

☑ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)   08/25/2015_____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

Judge Bluebond, US Bankruptcy Court, 255 E. Temple Street, Suite 1482, Los Angeles, CA 90012
Additional mail service list attached received pages 1-12 of the motion and Exhibits 1 and 2.

☑ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 08/25/2015    Lewis R. Landau | | /s/ Lewis R. Landau |
| *Date*            *Printed Name* | | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

| In re: Net Data Centers, Inc. | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:15-bk-12690-BB |

**ADDITIONAL SERVICE INFORMATION (if needed):**

NEF Service List (category I):

Paul A Beck on behalf of Debtor Net Data Centers, Inc. pab@pablaw.org
Paul A Beck on behalf of Plaintiff Net Data Centers, Inc. pab@pablaw.org
Ronald K Brown on behalf of Creditor The Realty Associates Fund IX, L.P. rkbgwhw@aol.com
Susan S Davis on behalf of Creditor Avanz Technologies, LLC sdavis@coxcastle.com
Susan S Davis on behalf of Creditor Chad Long sdavis@coxcastle.com
Robert L Eisenbach, III on behalf of Creditor DuPont Fabros Technology, L.P. reisenbach@cooley.com
Robert L Eisenbach, III on behalf of Creditor Fox Properties LLC reisenbach@cooley.com
Robert L Eisenbach, III on behalf of Creditor Grizzly Ventures LLC reisenbach@cooley.com
Robert L Eisenbach, III on behalf of Creditor Lemur Properties LLC reisenbach@cooley.com
Robert L Eisenbach, III on behalf of Creditor Whale Ventures LLC reisenbach@cooley.com
William F Govier on behalf of Debtor Net Data Centers, Inc. wgovier@taboadarochlin.com
Michael S Greger on behalf of Creditor Digital 2260 East El Segundo, LLC mgreger@allenmatkins.com
Michael S Greger on behalf of Creditor GIP 7th Street, LLC mgreger@allenmatkins.com
Michael S Greger on behalf of Interested Party Courtesy NEF mgreger@allenmatkins.com
Carl Grumer on behalf of Interested Party Netunim, Inc. cgrumer@manatt.com, bruiz@manatt.com
Brian T Harvey on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com
Brian T Harvey on behalf of Interested Party Courtesy NEF bharvey@buchalter.com, IFS_filing@buchalter.com;
dbodkin@buchalter.com
Lesley A Hawes on behalf of Interested Party Courtesy NEF lesley.hawes@dentons.com, chris.omeara@dentons.com
Brian L Holman on behalf of Creditor Charter Holdings, Inc. b.holman@mpglaw.com
Andy Kong on behalf of Creditor Anschutz Entertainment Group, Inc. Kong.Andy@ArentFox.com
Lewis R Landau on behalf of Debtor Net Data Centers, Inc. Lew@Landaunet.com
Lewis R Landau on behalf of Interested Party Courtesy NEF Lew@Landaunet.com
Lewis R Landau on behalf of Plaintiff Net Data Centers, Inc. Lew@Landaunet.com
Matthew A Lesnick on behalf of Interested Party Courtesy NEF matt@lesnickprince.com, tmims@lesnickprince.com;
matt@ecf.inforuptcy.com
Ron Maroko on behalf of U.S. Trustee United States Trustee (LA) ron.maroko@usdoj.gov
Carl Mueller on behalf of Creditor Avanz Technologies, LLC cmueller@maloneyfirm.com, llarios@maloneyfirm.com
Carl Mueller on behalf of Creditor Chad Long cmueller@maloneyfirm.com, llarios@maloneyfirm.com
Carl Mueller on behalf of Defendant Avanz Technologies, LLC cmueller@maloneyfirm.com, llarios@maloneyfirm.com
Carl Mueller on behalf of Defendant Chad Long cmueller@maloneyfirm.com, llarios@maloneyfirm.com
Jessica G Peterson on behalf of Interested Party Akamai Technologies, Inc. jpeterson@djplaw.com,
khughes@djplaw.com
Daren M Schlecter on behalf of Interested Party Courtesy NEF daren@schlecterlaw.com, assistant@schlecterlaw.com
Steven M Spector on behalf of Creditor Committee Official Committee of Creditors Holding Unsecured Claims
sspector@buchalter.com, IFS_efiling@buchalter.com;salarcon@buchalter.com
Steven M Spector on behalf of Interested Party Courtesy NEF sspector@buchalter.com, IFS_efiling@buchalter.com;
salarcon@buchalter.com
Wayne R Terry on behalf of Interested Party Courtesy NEF wterry@hemar-rousso.com
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                              F 9013-3.1

Law Offices of Paul A. Beck
Lewis R. Landau
13701 Riverside Drive. Suite 701
Sherman Oaks, CA  91423

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

IN RE:  Net Data Centers Inc.

| | |
|---|---|
| | CASE NO: 2:15-bk-12690 BB |
| | **DECLARATION OF MAILING CERTIFICATE OF SERVICE** |
| | Chapter: 11 |
| | ECF Docket Reference No. |
| | Judge: |
| | Hearing Location: 1475 |
| | Hearing Date: 9/1/2015 |
| | Hearing Time: 10:00 am |
| | Response Date: Bluebond |

On 8/25/2015, I did cause a copy of the following documents, described below,

Notice of and Motion to Approve Sale Procedures,

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice. com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R.Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

DATED: 8/25/2015

/s/ Lewis R. Landau
Lewis R. Landau  143391
Law Offices of Paul A. Beck
13701 Riverside Drive. Suite 701
Sherman Oaks, CA  91423
888 822 4340
Lew@Landaunet.com

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

IN RE:  Net Data Centers Inc.

CASE NO: 2:15-bk-12690 BB

**CERTIFICATE OF SERVICE
DECLARATION OF MAILING**

Chapter: 11
ECF Docket Reference No.
Judge:
Hearing Location: 1475
Hearing Date: 9/1/2015
Hearing Time: 10:00 am
Response Date: Bluebond

On 8/25/2015, a copy of the following documents, described below,

Notice of and Motion to Approve Sale Procedures,

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document(s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 8/25/2015

/s/ Jay S. Jump
Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Law Offices of Paul A. Beck
Lewis R. Landau
13701 Riverside Drive. Suite 701
Sherman Oaks, CA  91423

PARTIES DESIGNATED AS "NOT ON VIRTUAL/NOTICE LIST WERE NOT SERVED VIA THE MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

PAUL A. BECK APC
13701 RIVERSIDE DRIVE SUITE 701
SHERMAN OAKS CA 91423

786 NET DATA LLC
13092 ESTES CIRCLE
WESTMINSTER CA 92683

AKAMAI
150 BOROADWAY
CAMBRIDGE MA 02142

AMERICAN EXPRESS
BOX 0001
LOS ANGELES CA 90096-8000

ANSCHUTZ ENTERTAINMENT GROUP
865 S. FIGUEROA
LOS ANGELES CA 90017

AT&T
P.O. BOX 5025
CAROL STREAM IL 60197

AT&T LONG DISTANCE
P.O. BOX 5017
CAROL STREAM IL 60197

AT&T MOBILITY
P.O. BOX 6463
CAROL STREAM IL 60197-6463

AVANT COMMUNICATIONS
153 W. OHIO ST SUITE 500
CHICAGO IL 60654

AVANZ TECHNOLOGIES LLC
P.O. BOX 230974
CHICAGO IL 60654

CHAD LONG
2010-B GATES AVE
REDONDO BEACH CA 90278

CLEARVIEW
800 UNIVERSITY BLVD.
MOON TOWNSHIP PA 15108

COLORTRAQ
ONE GATEHALL DRIVE SUITE 208
PARSIPPANY NJ 07054

DB TRANSIT CONSULTING
1809 EAST BROADWAY
SUITE  338
OVIEDO FL 32765

DBR360
WEBSTER BANK
DEPT 11102
P.O. BOX 150421
HARTFORD CT 6115

DIGITAL REALTY TRUST
2260 EAST EL SEGUNDO BLVD.
EL SEGUNDO CA 90245

DLL FINANCIAL SERVICES INC.
111 OLD EAGLE SCHOOL RD
WAYNE PA 19087

DUPONT FABROS
1212 NEW YOPORK AVE NW SUITE 900
WASHINGTON DC 20005

FAKOURI ELECTRICAL ENG. INC.
30001 COMERCIO
RANCHO SANTA MARGARITA CA 92688

FIBERLIGHT LLC
P.O. BOX 602526
CHARLOTTE NC 28260-2526

FOX PROPERTIES LLC
1212 NEW YORK AVE NW
SUITE 900
WASHINGTON DC 20005

FPS SPECIALISTS IN FIRE SYSTEMS
1150 W. CENTRAL AVE
SUITE D
BREA CA 92821

FRONT PAGE COMMUNICATIONS GROUP
14518 GARFIELD AVE
PARAMOUNT CA 90723

GIP 7TH STEET INC.
C/O DIGITAL REALTY TRUST
600 W. 7TH STREET
LOS ANGELES CA 90017

GREG IPPOLITO
1601 N. SEPULVEDA #192
MANHATTAN BEACH CA 90266

GRIZZLY VENTURES LLC
1212 NEW YORK AVE NW
SUITE 900
WASHINGTON DC 20005

INFINITY DATA NETWORKS
3419 VIA LIDO SUITE 326
NEWPORT BEACH CA 92663

PARTIES DES...                                                        ...MA...
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

IPFS CORPORATION
1702 E. HIGHLAND AVE
SUITE110
PHOENIX AZ 85016

LEAF CAPITAL
P.O. BOX 644006
CINCINNATI OH 45264

LEMUR PROPERTIES LLC
1212 NEW YORK AVE NW
SUITE 900
WASHINGTON DC 20005

LIMELIGHT NETWORK
32409 COLLECTION CENTER DRIVE
CHICAGO IL 60693

MACQUAIRE EQUIPMENT FINANCE
ATTN: VENDOR CONTRACTS
P.O. BOX 2743
BLOOMFIELD HILLS MI 48303-2017

MICHAEL EDELL
MADDIEBRIT PRODUCTS LLC
537 CONSTITUTION AVE
SUITE B
CAMARILLO CA 93012

MOD MISSION CRITICAL LLC
9227 E. LINCOLN AVE #200-409
LONE TREE CO 80124

NAVSITE
400 MIONUTEMAN ROAD
ANDOVER MA 01810

NS CUBE LLC
3223 BAGLEY AVE #216
LOS ANGELES CA 90034

O&G CLEANING SERVICES
7053 IRONDALE AVE
WINNETKA CA 91306

PURCHASE POWER
P.O. BOX 371874
PITTSBURGH PA 15250

SOUTHLAND INDUSTRIES
7421 ORANGEWOOD AVE
GARDEN GROVE CA 92841

STRATACORE INC
2320 2ND AVENUE
SUITE 2100
SEATTLE WA 98121

SUMMIT FUNDING GROUP INC.
4680 OARKWAY DRIVE SUITE 300
MASON OH 45040

TELIA SONERA
LOCKBOX #4966
4966 PAYSPHERE CIRCLE
CHICAGO IL 60674

TERRY SPOORS
LEVINE & BLIT LLP
8383 WILSHORE BLVD  SUITE 945
BEVERLY HILLS CA 90211

TINET SPA
DEUTSCHE BANK
8484 WESTPARK DRIVE
SUITE 720
MC LEAN VA 22102

TOTAL CORPORATE SOLUTIONS
19500 NORMANDIE AVENUE
TORRANCE CA 90502

TW TELECOM
P.O. BOX 172567
DENVER CO 80217-2567

UNIVERSAL E-BUSINESS SOLUTIONS
702 ADAMS STREET 3RD FLOOR
HOBOKEN NJ 07030

VERIZON
P.O. BOX 660720
DALLAS TX 75266

VISIONAIRE
6700 E. PACIFIC COAST HIGHWAY
SUITE 201
LONG BEACH CA 90803

WEBSCALE
58 JOHN STREET #8C
NEW YORK NY 10038

WELLS FARGO -CHARTER HOLDINGS INC
DEPARTMENT 887995
LOS ANGELES CA 90088-7995

WESTERN EQUIPMENT FINANCE
P.O. BOX 640
503 HWY 2 WEST
DEVILS LAKE ND 58301

WHALE VENTURES LLC
1212 NEW YORK AVE NW
SUITE 900
WASHINGTON DC 20005

WILLIS CORPORATION
P.O. BOX 10162
PASADENA CA 91189

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA USPS FIRST CLASS MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

*INTERNATIONAL*

MAHAIPAL REDDY BANALA
37 MIDRAND GARDENS
1 KAUFMANN ROAD
MIDRAND 1686
SOUTH AFRICA

AUDITWERX
3000 BAYPORT DRIVE SUITE 480
TAMPA FL 33607

DATA SALES CO.
3450 WEST BURNSVILLE PARKWAY
BURNSVILLE MN 55337


NFS LEASING
900 CUMMINGS CENTER
SUITE 309-V
BEVERLY MA 01915

PRINCIPAL
711 HIGH STREET
P.O. BOX 10431
DES MOINES IA 50306

QUOTECOLO
66 LIVINGSTON DRIVE
PLYMOUTH MA 2360


REALTY ASSOCIATES FUND IX LP
DAVIS PARTNERS LLC
P.O. BOX 848590
LOS ANGELES CA 90084

ZAYO GROUP
P.O BOX 952136
DALLAS TX 75395

PERVEZ DELAWALLA
898 N. SEPULVEDA SUITE 500
EL SEGUNDO CA 90245


CHAD LONG C/O THE MALONEY FIRM
2381 ROSECRANS AVENUE SUITE 405
EL SEGUNDO CA 90245

CIT FINANCE LLC. C/O WELTMAN WEINBERG
& REIS
705 MARLANE DRIVE
GROVE CITY OH 43123

GRAYBAR ELECTRIC COMPANY INC ATTN:
AMBER GEITHMAN FINANCIAL MGR
8170 LACKLAND RD
BEL RIDGE MO 63114